(No. 50098.—

*In re* BENJAMIN JULIAN ROSENTHAL *et al.*, Attorneys, Respondents.

*Opinion filed Oct. 6, 1978.—Rehearing denied Dec. 1, 1978.*

Mary M. Conrad and John C. O'Malley, of Chicago, for the Administrator of the Attorney Registration & Disciplinary Commission.

Barry J. Freeman, of Freeman, Atkins & Coleman, Ltd., of Chicago, for respondent Benjamin Julian Rosenthal.

Joseph A. Lamendella, of Schippers, Betar, Lamendella & O'Brien, of Chicago, for respondent Donald S. Carnow.

MR. JUSTICE MORAN delivered the opinion of the court:

This disciplinary proceeding comes before us on exceptions to the report and recommendation of the Review Board of the Attorney Registration and Disciplinary Commission, which approved the hearing panel's recommendation that respondents, Benjamin J. Rosenthal and Donald S. Carnow, be disbarred. That recommendation resulted from a complaint filed by the Administrator of the Commission against the respondents charging them with unethical conduct by their participation in and facilitation of an extortion scheme perpetrated against their client by a public official. The complaint charged that the respondents had concealed or knowingly failed to disclose the existence of criminal activity; counseled and knowingly participated in activities in furtherance of a crime; engaged in conduct that was prejudicial to the administration of justice and which adversely reflected on

their fitness to practice law; and engaged in conduct which had the appearance of impropriety. Respondent Carnow was additionally charged with making false and misleading statements to Federal investigating agents.

In 1969, Rosenthal represented Joseph R. Pecord in matters concerning the purchase and use of a bank building, located in the city of Chicago and owned by the Federal Savings and Loan Insurance Corporation (FSLIC), which building Pecord intended to convert into a nursing home. Because the property was not zoned for such use, a zoning variance had to be obtained. The purchase contract, which had a closing date of July 1, 1969, was not contingent upon Pecord's success in securing rezoning. Failure to complete the contract would result in Pecord's forfeiture of his $50,000 down payment and other preparatory expenditures incurred by him.

In 1969, Carnow, a 26-year-old, full-time assistant Attorney General, was serving Rosenthal as a part-time associate on a space-for-service basis. In April of that year, Carnow, on Rosenthal's behalf, visited the office of the city council's Committee on Building and Zoning (Committee) and acquired information concerning procedures for seeking rezoning and obtaining an early hearing date. While at the Committee's office, Carnow met Stanley Zima, the secretary of the Committee. Carnow, who had been formerly acquainted with Zima, explained the nursing home project to him. Before Carnow left, Zima offered to assist him and Rosenthal in drafting their petition. Respondents accepted Zima's assistance. A petition was thereafter filed and a hearing date was set for June 20, 1969.

On or about June 17, 1969, Carnow received a call from Zima. Zima told Carnow that their petition was doomed because the ward committeeman and several neighborhood residents were opposed to the rezoning. Zima offered to help but told Carnow it would cost their

client some money.

Carnow related this information to Rosenthal, and respondents arranged a meeting with Zima for the following day. At the meeting, Zima repeated to Rosenthal that which he had previously told Carnow. Zima informed the respondents of a zoning ordinance which was pending before the city council, and said that, if passed, the ordinance would permit respondents to bypass the Committee and file directly with the zoning board of appeals. Zima indicated that, to assure the ordinance's passage, he would have to undertake, on Pecord's behalf, "multiple obligations" of $20,000 to $30,000. Pecord could pay the money either as a political contribution or as attorney fees. Respondents rejected Zima's suggestion and indicated that they would proceed to the Committee's hearing on the merits of their case.

On June 20, 1969, several citizens and a ward committeeman appeared at the hearing and objected to Pecord's petition. The Committee deferred action on the petition and thereby deprived respondents of a final order from which they could appeal. (The petition was ultimately denied.)

Rosenthal met with Pecord after the hearing and informed him that he, Rosenthal, had been forewarned that objectors would be at the hearing. Rosenthal did not tell Pecord of the conversation with Zima, but did discuss the possibility of pursuing the zoning board of appeals route should the city council pass the pending ordinance. Rosenthal suggested to Pecord that they contact FSLIC officials for an extension.

Several days after the hearing, Zima contacted Carnow and told Carnow that the zoning ordinance had passed. Carnow related this information to Rosenthal, who expressed his enthusiasm at the prospects of obtaining the needed zoning variance on its merits. Rosenthal filed his zoning petition with the administrator of the zoning board

of appeals and, at Pecord's request, dictated a letter to the FSLIC requesting an extension. A limited extension was obtained.

In a series of phone calls during the next few weeks, Zima informed Carnow, in substance, that Pecord would never get his rezoning unless Pecord accepted Zima's assistance. Zima stated that he would supply Pecord with "special zoning counsel" who would accept Pecord's payment as "attorney fees." Carnow related these conversations to Rosenthal, and Rosenthal, for the first time, informed Pecord of Zima's demand.

During the interim, the zoning board of appeals administrator recommended that Pecord's petition be denied.

Efforts toward obtaining further extensions on the contract with FSLIC failed. During the final week of July, Rosenthal and Pecord discussed Zima's offer. Rosenthal, according to his testimony at the disciplinary hearing, counseled Pecord against agreeing to Zima's demands and encouraged Pecord to seek further extensions to afford them time to seek review in the courts, if necessary. Rosenthal advised Pecord that if Pecord agreed to Zima's proposal, he, Rosenthal, would have to withdraw from the case. (Thomas Gordon, an acquaintance of Pecord's, was present during this conversation and corroborated Rosenthal's testimony.) Pecord, however, decided to accept Zima's offer of "assistance" in return for the promised zoning.

Rosenthal did not withdraw but, instead, instructed Carnow to inform Zima of Pecord's decision. (Rosenthal specifically told Carnow that "If [Zima] can help us and if he can keep it down to $20,000 or less and we get the rezoning and our client doesn't have to pay any additional monies unless we get rezoning, let's go ahead, but we have got to act fast. Otherwise he loses everything.") Carnow informed Zima of Pecord's decision. As instructed, the

respondents filed a petition to have the zoning board of appeals review their administrator's adverse recommendation. A hearing date was set for August 26, 1969.

Thereafter, Rosenthal and Carnow discussed withdrawing from the case, and they agreed that, unless Zima provided Pecord with "special zoning counsel" as promised, they would withdraw. Rosenthal instructed Carnow to arrange for Zima to meet with them to inform them of the identity of the special counsel. On August 15, 1969, the three met. Zima informed the respondents that there would be no special counsel and that his "obligations" were now theirs. Rosenthal objected and indicated he would go to Federal authorities, to which Zima responded that if Rosenthal did so, he and Carnow would never again practice law in the city of Chicago.

The respondents did not withdraw, and, on or about August 26, 1969, the zoning board of appeals approved Pecord's petition for rezoning. No objectors appeared at the hearing before the zoning board of appeals. Thereafter, Zima demanded payment. Before making payment, respondents required Zima to provide them with proof of the zoning board's decision. Zima did so; the money was obtained, and the payment was made in Rosenthal's law office.

In 1972, Federal agents, pursuant to a lead, discovered several of Pecord's checks which were marked "rezoning." Carnow learned of the investigation through Rosenthal and contacted two Federal agents to arrange for a meeting. Before that meeting could take place, Carnow, while at city hall, happened by chance to see Zima. Zima instructed Carnow to tell the agents that the money had been paid to a person who had since died. He threatened Carnow and Rosenthal with physical harm if they did not do as they were told. On the day prior to Carnow's meeting with Federal agents, Carnow's auto was set afire. (It was later learned that several such fires had occurred in Carnow's

neighborhood during the previous weeks.)

When Carnow met with the agents, he told them he knew nothing about a payoff and stated that he had had very little to do with the Pecord rezoning.

After that meeting, Carnow retained private counsel. Both Carnow and Rosenthal obtained immunity from prosecution in exchange for their testimony against Zima. Zima was convicted in the Federal district court of extortion and income tax evasion.

At the hearing before the hearing panel, several reasons for the failure to withdraw or disclose the criminal activity were offered by Carnow, *e.g.*, deference to Rosenthal's judgment, fear for his own safety, and possible economic repercussions from within city hall. Carnow stated that he had heard of acts of violence within Zima's ward, acts allegedly fostered or encouraged by Zima, and believed that Zima was capable of carrying through with his threats. He stated that, during the summer of 1972, he and Rosenthal had a disagreement over whether they should come forward with information regarding the extortion, but that Rosenthal had indicated he would consider any such disclosure a breach of their attorney-client relationship. Carnow admitted that he had not been forthright with the agents, but contended that, during the summer of 1972, he was under a great deal of stress. The latter statement was corroborated, to some extent, by Carnow's psychologist.

A number of witnesses appeared on Carnow's behalf and testified to his reputation for honesty, integrity and service to the community. Affidavits were also presented from persons who would have similarly testified if called.

Rosenthal admitted that he did not reveal the crime to prosecutorial authorities but testified that, both before and after the payment to Zima, he had informed certain FSLIC officials of the extortion scheme hopeful that they would intercede on Pecord's behalf. (No FSLIC official,

however, was called to substantiate this claim.) John A. Nordberg, an attorney who represented the FSLIC in the Pecord contract matter, testified that he had never been informed of any extortion plot against Pecord.

Like Carnow, Rosenthal offered several reasons for his failure to withdraw and his failure to disclose the crime. Among the reasons were the attorney-client confidentiality requirement, the political realities that allegedly existed at that time, and the possibility of economic or physical repercussions being brought against him or his client.

In mitigation, Rosenthal detailed his participation in professional and community service organizations. Several individuals testified as to Rosenthal's good reputation, and affidavits from other individuals, attesting to the same, were introduced into evidence.

Among its findings of fact, the hearing panel found that respondents were retained by Pecord for the lawful, legal purpose of obtaining a zoning variance; that, on the record before them, it appeared Pecord was entitled to the requested zoning variance but that his original petition was denied because of "political implications," that it was irrelevant that respondents had counseled their client against paying Zima's demand since the money was, in fact, paid and respondents played an active role in such payment. The panel further found that it was "probably believable that [respondents] and their families were threatened by Zima with economic and bodily harm" and that their client was also threatened. The panel concluded that Carnow had evaded telling the truth to Federal agents, that respondents had concealed criminal activity by failing to notify proper authorities, and that they knowingly counseled, assisted and participated in conduct which resulted in the furtherance of the crime of extortion.

On review before the Review Board, respondents took exception, *inter alia,* to the hearing panel's finding that they knowingly counseled, assisted and participated in

conduct which resulted in the crime of extortion. The Review Board agreed with the hearing panel's findings of fact. The Review Board held that the evidence clearly established that respondents maintained contact with the extortionist; that they freely aided the extortionist in communicating his demands to their client; and that they did not withdraw their representation of Pecord when it became apparent that he would submit to the extortion. The Review Board concluded that "Participation by an attorney in an extortion is an offense which warrants disbarment ***."

Here, respondents maintain that they are not legally or morally responsible for their conduct inasmuch as they were the unwilling victims of Zima's extortion demands. Their assertion that they, out of fear for their own safety and economic well-being, had no choice but to follow through with Zima's scheme is unpersuasive. Even if we assume that some sort of veiled threat was made against the respondents during their August 15 meeting with Zima, such threat would not explain or justify respondents' voluntary participation in the case prior to that date or their attempt to facilitate retention of "special zoning counsel" for Pecord. Furthermore, requiring the extortionist to produce proof of his misdeeds as a condition of payment does not seem the likely act of individuals acting under duress. Rather, it appears to be the act of persons seeking a guarantee that their client has received the service for which they had bargained.

The court, in *United States v. Kahn* (2d Cir. 1973), 472 F.2d 272, 278, aptly noted:

"Almost every bribery case involves at least some coercion by the public official; the instances of honest men being corrupted by 'dirty money,' if not nonexistent, are at least exceedingly rare. The proper response to coercion by corrupt public officials should be to go to the authorities, not to

make the payoff. Thus, unless the extortion is so overpowering as to negate criminal intent or willfulness, we would be loath to allow those who give in to the illegal coercion to claim it as a total defense to bribery charges."

Respondents assert, however, that had they notified authorities, their disclosure would have, at that time, fallen on politically deaf ears and could have possibly resulted in retaliation by political forces against them or their client. This is not only a wholly unacceptable excuse but, in fact, is specifically refuted, in part, by respondent Carnow's attorney, Joseph Lamendella, who testified that, based on his past experience in the United States Attorney's office, disclosure of Zima's activities would have been promptly acted upon.

Corruption within government could not, in most instances, thrive but for those few attorneys, who, like respondents, are willing to tolerate such illegal activity if it will benefit their client. The practice of law is a privilege and demands a greater acceptance of responsibility and adherence to ethical standards than respondents have demonstrated. Their conduct, in facilitating and participating in the paying of money to Zima, was clearly a breach of required professional conduct. Their activities discredited the integrity of the bar and impeded the administration of justice. For these reasons, we find that discipline must be imposed.

Respondent Carnow maintains that he should be disciplined less severely than respondent Rosenthal inasmuch as Pecord was Rosenthal's client, and he, Carnow, merely followed his employer's directions. Respondent Carnow has apparently overlooked the fact that, during his involvement herein, he was serving as an assistant Attorney General. Despite his obligations as a law officer, he knowingly participated in and furthered conduct which he knew to be illegal, and then, further, deliberately misled

Federal agents. That Carnow was under emotional stress at the time does not excuse his failure to be forthright. In mitigation, however, we recognized Carnow's previous professional accomplishments.

We have also considered respondent Rosenthal's evidence in mitigation and his contention that, as an attorney, he was duty bound not to abandon his client in a time of need and was obliged to avoid actions which would, potentially, cause his client harm.

One of Rosenthal's excuses for not informing prosecutorial authorities is that such disclosure would have breached required attorney-client confidentiality. If Rosenthal, as he testified, informed certain FSLIC officials of the extortion scheme in the hope that they would intercede, it seems rather inconsistent to now argue that disclosure to some public authorities, but not to others, would constitute a breach of the confidentiality requirement. Whatever reasons Rosenthal might have had for not disclosing the criminal activity to individuals in a position to take direct action, it does not appear that scrupulous observance of an alleged attorney-client confidentiality requirement was one of those reasons. Without Rosenthal's assistance as an intermediary, Zima would have had considerably more difficulty in carrying out his scheme. We find Rosenthal's continued participation in the extortion plans to be without justification.

Accordingly, it is ordered that respondents be disbarred.

*Respondents disbarred.*

MR. JUSTICE CLARK took no part in the consideration or decision of this case.