(No. 55284.—

*In re* FRANK H. MASTERS, JR., Attorney, Respondent.

*Opinion filed June 18, 1982.*

RYAN, C.J., took no part.
MORAN and SIMON, JJ., dissenting.

Mary M. Conrad, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

Sidney Z. Karasik and A. Bradley Eben, of Chicago, for respondent.

JUSTICE GOLDENHERSH delivered the opinion of the court:

On February 7, 1980, the Administrator of the Attorney Registration and Disciplinary Commission filed a complaint against respondent, Frank H. Masters, Jr., who was admitted to the practice of law on October 14, 1937. The complaint charged that respondent advised a client to comply with an extortion demand, volunteered to, and did, serve as intermediary in making the payments, and that by reason of such conduct respondent:

"(a) concealed or knowingly failed to disclose or come forward with information about the existence and commission of criminal activity in violation of Canon 7 D.R. 7—102(A)(3) of the Illinois Code of Professional Responsibility [(Illinois State Bar Association (1970))];

(b) counseled and knowingly assisted and participated in conduct which resulted in the furtherance of a crime in violation of Canon 7, D.R. 7—102(A)(7) of the Code;

(c) engaged in conduct involving fraud, deceit and moral turpitude, in violation of Canon 1, D.R. 1—102(A)(3 and 4) of the Code;

(d) engaged in conduct that is prejudicial to the administration of justice and that adversely reflects on his fitness to practice law in violation of Canon 1, D.R. 1—102(A) (5 and 6) of the Code;

(e) engaged in conduct involving the appearance of impropriety."

A panel of the Hearing Board recommended that respondent be suspended for one year. Both the Administrator and

respondent filed exceptions to the report of the hearing panel. The Review Board ordered that respondent be suspended for six months. Respondent filed exceptions to the report of the Review Board, and upon allowance of his petition filed pursuant to Rule 753(e) (73 Ill. 2d R. 753(e)), the Administrator also filed exceptions to the report.

The testimony at the hearing before the panel of the Hearing Board shows that in the early fall of 1969, William Griffin, an executive officer of Hoffman-Rosner Corporation, a construction company, came to respondent's law firm for advice concerning an extortion demand made by Edward Arambasich, a business agent for the Iron Workers' Union. Several years earlier Hoffman-Rosner Corporation had expanded its operations into Will County and on the recommendation of its Chicago counsel had become a client of respondent's law firm. The partner who handled Hoffman-Rosner's legal matters asked respondent to confer with Griffin about the extortion attempt.

Respondent testified that from 1952 to 1964 he served as State's Attorney of Will County. During that period the office of State's Attorney was not a full-time job and he was permitted to engage in the private practice of law. In 1977 he was appointed Special Assistant Attorney General, a post which he held at the time of the hearing. During his term as State's Attorney respondent had become aware of Arambasich's reputation for violence. Respondent related numerous incidents in which Arambasich and those associated with him were involved in union-related violence at job sites. As State's Attorney respondent attempted to persuade several victims of Arambasich's beatings and threats to prefer charges against him, but neither the victims nor anyone else respondent contacted was willing to testify. Respondent testified that his son, a college student, worked as an ironworker during the summers of 1967 through 1971 under the jurisdiction of Arambasich's

union. Respondent's son had told him of incidents when Arambasich was observed at various job sites, exhibiting a gun and threatening contractors and other labor leaders. Other witnesses also testified to Arambasich's reputation for violence.

Respondent testified that Griffin told him that Arambasich visited a Hoffman-Rosner job site at Bolingbrook and demanded an interview with the Hoffman-Rosner foreman. Arambasich had placed a gun on a desk and told the foreman that he wanted $1,000 every six months and that "he was going to shut down the job if it wasn't paid, and indicated physical harm." The foreman related the incident to Griffin. Respondent told Griffin that he was aware of Arambasich's reputation for violence. He advised Griffin that this was obviously an extortion plot and that normally he would not advise a client to comply, but under the circumstances it would be in the best interest of the personnel of Hoffman-Rosner that the payments be made. Griffin told respondent that Arambasich told the foreman that he would not deal with anyone from Hoffman-Rosner and asked respondent if he would see that the payments were delivered to Arambasich. Respondent stated that he was willing to deliver the payments. Respondent explained to Griffin that he feared for the personal safety of the Hoffman-Rosner employees, as well as his own safety and that of his son. Respondent felt that in his small community if he advised Hoffman-Rosner not to make the payments word would get to Arambasich that it was respondent who "shut him off" and since he no longer had the protection of the State's Attorney's office he would be in danger of physical harm.

It is not clear from the testimony whether respondent was aware at the time of his initial consultation with Griffin that the Hoffman-Rosner executive board had decided to refuse to comply with Arambasich's demand. Respondent testified that he was not told of the board's

decision to refuse payment. Griffin testified that he could not remember whether he had told respondent at their first meeting of the board's decision, but he assumed that he had done so. Griffin testified that he informed the Hoffman-Rosner executive board of respondent's opinion and that a few days after his initial meeting with respondent the board decided to follow respondent's advice. Griffin testified that the decision to comply with the extortion demands was based primarily on respondent's advice, although "we [the board] had conversations with [the foreman] after that and he was quite concerned about the situation on the project, the danger that personnel would be subjected to, particularly himself." Griffin had personally been confronted by Arambasich on one occasion, at which time Arambasich had made threats against the company and against Griffin, demanding money. Griffin paid Arambasich $50 at that time from his pocket "to get out of there." Griffin thought he had told the board members of this incident but was not certain when he had done so.

Respondent testified that several days after the consultation with Griffin he received a package from Hoffman-Rosner. Respondent did not open the package. He called Arambasich and told him that his law firm represented Hoffman-Rosner and that they were prepared to meet his demand. Arambasich told respondent he would meet him in front of his office. Arambasich drove up to the front of respondent's office building and told respondent to get into his car. When respondent entered the automobile he saw a gun lying on the transmission hump. Arambasich drove around the block and stopped. He opened the package, which contained U.S. currency. He offered respondent $100, which he declined. Arambasich drove back to respondent's office building, and respondent left the car and returned to his office. Respondent testified

that viewing the gun had greatly frightened him. On nine additional occasions, approximately six months apart, respondent received a call from Arambasich, who said, "D.A. [indicating State's Attorney], it's about that time." Respondent called Griffin and told him Arambasich had called. A day or two later a package from Hoffman-Rosner arrived at respondent's office. Respondent called Arambasich, met him at the front of his office building, and handed the package to him. At these subsequent encounters respondent was not asked to enter Arambasich's car and did not again do so.

The final payment was made in the spring of 1974. Respondent conferred with Griffin, and it was decided that the time had come to stop the payments. Respondent called Arambasich and told him that "it ought to stop." Arambasich agreed. Subsequent to the termination of payments respondent retained counsel and told them of the extortion experience. He requested that they advise the United States Attorney's office concerning the situation.

At about the time of the termination of payments the business affairs of Hoffman-Rosner were being investigated by the Internal Revenue Service in connection with an unrelated matter. Respondent testified that at the time of his decision to stop payment he was unaware of any government investigation into the affairs of Hoffman-Rosner. Griffin testified that the investigation was a part of the reason for Hoffman-Rosner's decision to stop payment, but he was not certain that he had told respondent of the investigation.

The United States Attorney's office began investigating the activities of Arambasich in late 1974 or early 1975, and a grand jury investigation was initiated. A subpoena was issued to Hoffman-Rosner, but no subpoena was issued to respondent. At the request of one of respond-

ent's attorneys, the Department of Justice authorized an order granting immunity for respondent, and he testified at Arambasich's trial. Arambasich was found guilty of extortion and sentenced to several 10-year concurrent sentences based on his extortion of Hoffman-Rosner and other extortion cases. As the result of respondent's testimony at the trial the Executive Committee of the United States District Court for the Northern District suggested to the District Attorney that respondent's conduct should be investigated. Citing respondent's cooperation and testimony and taking the position that neither Hoffman-Rosner nor respondent was guilty of any crime, the United State's Attorney's office declined to take any steps to discipline respondent. The matter was referred to the Attorney Registration and Disciplinary Commission, and this proceeding was initiated.

The hearing panel, stating that it was not persuaded that respondent's fear for his personal safety was justified, noted that his experience as State's Attorney and Special Assistant Attorney General "was more persuasive to the contrary, *i.e.*, he should 'go to the authorities and expose the corruption.'" The panel also dismissed respondent's fear for the safety of his son, stating that a more reasonable course of events would have been for the son to give up his summer employment and thereby alleviate this fear. The panel concluded that respondent's conduct could not be justified on the ground that he acted out of fear for his client, noting that Hoffman-Rosner had initially decided to refuse payments.

Without holding that respondent had violated D.R. 7–102(A)(3) or D.R. 7–102(A)(7), the panel found that, on this record, respondent's fear could not serve as a defense to a violation of these rules. It pointed out that respondent's decision to terminate payment was not based on any significant change in the situation which allegedly

prompted the payments, and also pointed out his failure, even then, to notify the authorities. The panel, stating that "as an officer of the court, a lawyer has an obligation not only to his client but to the People of the State of Illinois," found that respondent had violated D.R. 1–102(A)(3) and D.R. 1–102(A)(4). Although it made no reference to D.R. 1–102(A)(5) it also found that "respondent's conduct was a breach of our standards and prejudicial to the administration of justice."

In recommending a sanction the panel found that respondent's misconduct was analogous to that of the respondents in *In re Rosenthal* (1978), 73 Ill. 2d 46. The panel found, however, that the cases were distinguishable due to the circumstances in aggravation and mitigation. It contrasted respondent's full cooperation with authorities with the attempt, in *Rosenthal,* to deceive the Federal agents. It also contrasted respondent's frank manner of testifying with the spurious defense of fear of breach of client confidentiality in *Rosenthal.* It noted the testimony and affidavits of the many outstanding persons concerning respondent's honesty, integrity and service to the community. It acknowledged that respondent's disruptive family life had caused him emotional anguish. Finally, it noted that no significant personal benefit had accrued to either respondent or his law firm by reason of respondent's participation in the extortion scheme. ($225 in legal fees paid over a four-year period.) The panel recommended that respondent be suspended from the practice of law for one year, rather than the disbarment recommended by the Administrator.

The Review Board made no finding of any specific violation of the Code of Professional Responsibility, but concluded that respondent "counseled and assisted his client in an illegal activity. In participating in the extortion scheme, [respondent] compromised and prejudiced the

administration of justice. Such conduct warrants discipline." The Board, stating that there were mitigating circumstances that the hearing panel did not fully weigh in considering the measure of discipline to be imposed, recommended that respondent be suspended for six months. The Board stated, "As respondent has pointed out, he did not aid the perpetrator of the extortion, but was making a good faith, if faulty, judgment that the best interests of his client/victim would be served by making the requested payments. Respondent had a legitimate basis for his fears of retaliation against both his client, himself, and his family." The Board noted respondent's acquaintance with the acts of violence by Arambasich and stated that respondent's position in the scheme was also mitigated by his family situation. The Board particularly noted that respondent had indicated that his judgment in the matter was clouded by his family situation and the threat he felt to his son's safety. As a final note, the Board pointed out that in the United States District Court respondent had testified fully and completely regarding the extortion scheme and as a result of that testimony Arambasich was serving a 10-year sentence in a Federal penal institution. The Board noted further that as a result of his testimony against Arambasich threats were made on respondent's life and well-being.

Respondent contends that his advice, given in good faith, to cooperate with the extortion demand under the threat of injury or death, and his conduct in not reporting the matter to the authorities under the circumstances here, should not subject him to any professional discipline. Respondent argues that the Administrator failed to prove that his alleged misconduct violated any legal duty or canon of ethical conduct. In attempting to refute the specific allegations of violations of the Illinois Code of Professional Responsibility, respondent relies on expert

opinions contained in offers of proof made at the hearing and contends that the Hearing Board erred in excluding the testimony.

In the hearing before the hearing panel respondent offered the testimony of two law professors. After proof of their background and qualifications respondent made offers of proof in which the professors analyzed the charges against respondent and by way of response to hypothetical questions concluded that his conduct constituted neither a crime nor a violation of a canon or rule of ethical conduct. The hearing panel sustained the Administrator's objections to the opinions.

Both the Hearing and Review Boards concluded that the expert testimony offered was unnecessary to the decision of this case. As shown by the offers of proof, the testimony consisted of an analysis of the specific disciplinary rules and ethical canons referred to in the complaint in terms of the evidence which was summarized in a hypothetical question. According to this testimony there was no violation of the specifically charged provisions of the Code. The hearing panel found no fault with the qualifications of the witnesses but refused to admit the testimony on the ground that it considered itself to be a body of experts and well able to resolve the issues before it. The panel stated that the standards to be applied in disciplinary cases are those standards of conduct acceptable to members of the bar in general rather than standards acceptable to a small group of lawyers who hold themselves "beyond and above the level of the Bar, in general, in the matter of professional conduct." An additional reason given for the exclusion was that expert testimony would place an excessive and unnecessary economic burden on both sides in disciplinary matters. The panel distinguished these costs from those incurred where questions of a scientific nature are involved on the ground

that the economic burden could not be avoided in those situations, whereas "legal" persons considering "legal" conduct do not require outside expertise. The Review Board concluded that the expert testimony was properly refused, stating: "[E]xpert testimony on the legal ethics was not essential for a proper disposition of the matter. Illinois courts have ruled that unless expert testimony is required, it should not be used."

Citing *In re Friedman* (1979), 76 Ill. 2d 392, and *In re Kutner* (1979), 78 Ill. 2d 157, respondent contends that expert testimony has been sanctioned as appropriate in disciplinary cases. In reference to the contention that the Hearing and Review Boards, as experts, have no need of expert opinions, respondent points out that the ABA Code of Judicial Conduct, Canon 3, Rule A(4) (1977), provides that a judge may obtain the advice of an expert "on the law applicable to a proceeding before him." Respondent urges the court to adopt the approach taken in *Lentino v. Fringe Employee Plans, Inc.* (3d Cir. 1979), 611 F.2d 474, and use the same criteria in determining whether expert testimony is admissible in professional disciplinary cases as in any other matter involving a standard of care, and that expert testimony should be admissible when the witness offered as an expert possesses peculiar knowledge or experience not common to the ordinary layman which renders his testimony an aid to the trier of fact.

The admissibility of expert testimony was not at issue in *Friedman* or *Kutner.* Although expert testimony may have been admitted and considered in those cases, they are not, as contended by respondent, authority for the proposition that when the ethical problem under consideration is unusual and fairly debatable expert testimony concerning the canons is admissible. In *Lentino* the court held that in bench trials of legal malpractice claims expert testimony was required to establish the relevant standard of conduct,

and whether the defendants had complied with that standard, except where the matter under investigation was "so simple, and the lack of skill so obvious, as to be within the range of the ordinary experience and comprehension of even non-professional persons." (611 F.2d 474, 481.) The rationale of the decision was that no practical standard existed which would take into account the trial judge's knowledge. The court stated that such a subjective standard, which would permit the trial judge, if he were familiar with the appropriate standard of conduct, to use his own knowledge, would effectively change a question of fact finding into one of discretion, and would require appellate courts to undertake the unwanted task of evaluating the trial judge's personal knowledge.

In contrast to legal malpractice cases, the standards of ethical conduct pertinent to disciplinary proceedings are set out in the Code of Professional Responsibility (79 Ill. 2d R. 1–101 *et seq.*). The expert testimony was offered here for the purpose of establishing the meaning of the disciplinary rules and the ultimate conclusion that no provision of the Code had been violated. Although opinions of qualified writers and *amicus* briefs are considered by this court, they are not an appropriate subject of expert testimony.

It is respondent's contention that the suggestion to the Executive Committee of the United States District Court for the Northern District that respondent's conduct be examined, and from which this proceeding emanated, was based on the erroneous impression that his conduct constituted the offense of misprision of felony. He argues, correctly, that under the authorities, the offense of misprision requires more than mere silence or inaction concerning knowledge of the actual commission of a felony, and must be accompanied by "an affirmative act of concealment." (See *United States v. Daddano* (7th Cir. 1970), 432 F.2d

1119, 1124; *United States v. Hodges* (9th Cir. 1977), 566 F.2d 674.) He argues that absent the violation of a statute there can be no violation of D.R. 7—102(A)(3). He argues that there was no violation of D.R. 7—102(A)(7), which provides that a lawyer shall not "counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent." He points out that he was the agent for the victim, not the perpetrator, and quotes one of his expert witnesses to the effect that "It's not a crime to be a victim." He argues, too, that the Administrator failed to establish corrupt motive for his conduct.

It is the Administrator's position that our decision in *In re Rosenthal* (1978), 73 Ill. 2d 46, supports a finding of professional misconduct and the sanction of disbarment. Respondent argues that *Rosenthal* is clearly distinguishable. He points out that the lawyers there actively participated in negotiations that resulted in the bribe of a public official and sought assurances that in paying the bribe their client would receive what he "bargained for." Here the client unwillingly paid the extortionist's demands for something to which it was already entitled, freedom from physical assault and economic reprisal. Respondent states that the claim of duress was apparently rejected in *Rosenthal* due to lack of evidence, noting that the threats came after the bribery scheme had commenced, whereas duress, under the circumstances here, has been acknowledged by both the Hearing and Review Boards. Respondent contends that the motives of the respondents differ in that the respondents in *Rosenthal* participated in the scheme in order to save a business deal for their client, thereby protecting their own fee, whereas respondent here acted out of fear for the safety of himself, his family and others. He points out, too, that the fees paid to respondent's firm in relation to respondent's activities were nominal. Respondent further points out that it is apparent from reading the decision in *Rosenthal* that this court was highly skeptical

of the respondents' cooperation and truthfulness in dealing with the authorities, whereas he has repeatedly been commended by prosecutorial authorities. He points to the fact that he instructed his attorneys to come forward and report the extortion scheme to the United States authorities without a subpoena having been issued for his appearance. Respondent asks that the court recognize that he acted as an agent for the victim of the extortion, and that the conduct and motive of the extortionist cannot be attributed to him.

The Code of Professional Responsibility (79 Ill. 2d R. 1—101 *et seq.*), which states the minimum level of conduct acceptable from a member of the legal profession, provides that a lawyer shall not "engage in conduct that is prejudicial to the administration of justice" (79 Ill. 2d R. 1—102(a)(5)). Assuming, *arguendo,* that at the time of the first payment to Arambasich there was a basis for respondent's fear of harm to his son, his client's personnel or himself, it is difficult to explain the failure to report the extortion for more than four years. As did the hearing panel, we note the evidence shows no change of circumstances which diminished the alleged danger. As an attorney, former State's Attorney, and in his capacity of Special Assistant Attorney General, respondent was certainly aware of the fact that the proper course of conduct was to report the extortion demand to the appropriate authorities. For a lawyer of respondent's demonstrated ability and standing at the bar to serve as the conduit through which funds were passed from the alleged victim to the extortionist was unprofessional and unseemly and served to bring the legal profession into disrepute. Although we are not aware of any decision that a rule similar to Rule 1—102(a)(5) was violated in circumstances that did not involve a pending or contemplated legal proceeding, we are of the opinion that its scope is not so limited. We agree with the hearing panel that respondent's conduct "was a

breach of our standards" and with both the panel and the Review Board that it was "prejudicial to the administration of justice."

The determination of the appropriate sanction to be imposed is not without difficulty. Unprofessional conduct may result in sanctions even though "a corrupt motive and moral turpitude are not clearly shown." (*In re Ahern* (1961), 23 Ill. 2d 69, 74; see also *In re Chapman* (1978), 69 Ill. 2d 494; *In re Levin* (1979), 77 Ill. 2d 205.) Many of the circumstances which aggravated the original offense in *Rosenthal* are not shown here. Nevertheless, there is no question that for a period of approximately four years respondent participated in activities which enabled an extortionist to continue his illegal conduct. This court has consistently held that one of the purposes of a disciplinary proceeding is to maintain the integrity of the legal profession. The effectuation of that purpose requires that respondent be suspended from the practice.

We are aware of respondent's standing at the bar of the community in which he has practiced law and of the high esteem in which is held by the many individuals who testified or filed statements in his behalf. We have duly noted the difficult period in respondent's personal life resulting from the illness and death of his wife. We agree with the hearing panel and the Review Board that these served to mitigate the seriousness of his unprofessional conduct. In our opinion the hearing panel accorded proper weight to these mitigating circumstances and the appropriate sanction to be imposed is that respondent be suspended for a period of one year.

*Respondent suspended.*

RYAN, C.J., took no part in the consideration or decision of this case.

JUSTICE MORAN, dissenting:

Today's opinion states that "[a]s an attorney, former

State's Attorney, and in his capacity of Special Assistant Attorney General, respondent was certainly aware of the fact that the proper course of conduct was to report the extortion demand to the appropriate authorities. For a lawyer of respondent's demonstrated ability and standing at the bar to serve as the conduit through which funds were passed from the alleged victim to the extortionist was unprofessional and unseemly and served to bring the legal profession into disrepute." (91 Ill. 2d at 427.) Despite this broad and warranted condemnation of respondent's behavior, the majority concludes that suspension for one year is an appropriate sanction. Because I believe that the discipline imposed is inconsistent with this court's holding in *In re Rosenthal* (1978), 73 Ill. 2d 46, *cert. denied* (1979), 440 U.S. 961, 59 L. Ed. 2d 775, 99 S. Ct. 1505, and does not adequately consider the severity of respondent's misconduct, I must respectfully dissent.

In *In re Rosenthal*, respondents, Carnow and Rosenthal, negotiated and participated in a bribery scheme perpetrated against their client by a public official. Rosenthal's corroborated testimony at the disciplinary hearing indicated that he initially advised his client to reject the attempted bribe or he would withdraw from the case. Ultimately, however, he did not withdraw and instead facilitated the bribery consisting of one $20,000 payment. Although Carnow was, at first, untruthful to Federal agents investigating the transaction, he and Rosenthal subsequently obtained immunity from prosecution in exchange for their testimony against the public official. The latter was later convicted of extortion and income tax evasion.

During the disciplinary hearing in that case, numerous witnesses appeared on respondents' behalf and attested to their good reputation and service to the community. Also offered in mitigation was Rosenthal's testimony that they did not withdraw from the case and disclose the crime be-

cause of fear of economic, political and physical reprisal against themselves or their client, and because of the attorney-client confidentiality requirement. Carnow additionally asserted that he was under emotional stress at the time of the transaction.

This court duly considered the factors offered in mitigation but found them unpersuasive and insufficient to warrant a sanction less than disbarment. Now, in the instant case, which parallels *Rosenthal* in a number of particulars, the majority concludes that a one-year suspension is justified. It apparently so holds because "[m] any of the circumstances which aggravated the original offense in *Rosenthal* are not shown here." 91 Ill. 2d at 428.

While it is true that in *Rosenthal* respondents actually negotiated the bribery payment, they also initially advised against their client's involvement in the transaction. In the instant case, the respondent counseled his client from the very beginning to meet the extortionist's demands and, as in *Rosenthal*, delivered the payments himself. He contends that he so advised his client because he knew of Arambasich's propensity for violence and feared for the safety of his client and son, as well as his own. However, the attorney's fear of reprisal did not persuade this court to enter a sanction less than disbarment in *Rosenthal*. While there the threats did not occur until after the bribery payment, nevertheless, if fear of reprisal is not considered sufficient to conceal an illegal payment, it certainly should not be a sufficient justification for making the payment. Respondent's fear for the safety of his son could have been avoided by the son's obtaining other summer employment. Finally, in this regard, respondent eventually did disclose to the authorities the illegal transactions. As noted by the majority, "the evidence shows no change of circumstances which diminished the alleged

danger." 91 Ill. 2d at 427.

Respondent points out that, in *Rosenthal,* the attorneys participated in the bribery scheme to protect a client's business interests, whereas, in the instant case, the payment was allegedly made to protect the client's safety. Inasmuch as bribery is reprehensible conduct which cannot be countenanced to protect a client, the particular "interest" involved is irrelevant. Regardless of what prompts a bribery attempt, an attorney's proper response is to disclose that attempt to the appropriate authorities. D.R. 7–102(A)(3), (A)(7).

In both cases, respondents submitted mitigating circumstances. While it is true that an additional aggravating circumstance in *Rosenthal* was respondent's initial lack of candor in dealing with the authorities, this factor is more than offset in the instant case by respondent's repeated transgressions. We are not dealing with an isolated instance of misconduct such as the single bribery payment at issue in *Rosenthal,* and in cases where suspension was deemed an appropriate sanction. (See *In re Porcelli* (1979), 77 Ill. 2d 473; *In re Kien* (1977), 69 Ill. 2d 355; *In re Kayne* (1973), 53 Ill. 2d 410.) Nor is a question of negligence or lack of care involved, which conduct " ' *** would justify imposition of a sanction less than disbarment. ***' " (*In re Hopper* (1981), 85 Ill. 2d 318, 324, quoting *In re Saladino* (1978), 71 Ill. 2d 263, 276.) Rather, respondent intentionally participated in an extortion scheme on 10 separate occasions over a period of five years. (*Cf. In re Feldman* (1982), 89 Ill. 2d 7 (disbarment warranted in conversion cases where intentional improper acts extended over a period of time); *In re Fumo* (1972), 52 Ill. 2d 307 (same principle involving fraudulent activity).) It is anomalous that the administration of justice should be obstructed for five years, while a perpetrator thereof is suspended for one. This is particularly unfortunate

because, assuming Arambasich's character is as reprehensible as we are led to believe, respondent's failure to report his activities undoubtedly caused other members of the public to suffer the extortionist's demands. The only fact more clear than respondent's obligation in this case was his failure to live up to it.

"Corruption within government could not, in most instances, thrive but for those few attorneys, who, like [respondent], are willing to tolerate such illegal activity if it will benefit their client. The practice of law is a privilege and demands a greater acceptance of responsibility and adherence to ethical standards than [respondent has] demonstrated." *In re Rosenthal* (1978), 73 Ill. 2d 46, 56, *cert. denied* (1979), 440 U.S. 961, 59 L. Ed. 2d 775, 99 S. Ct. 1505.

For these reasons, I believe that disbarment is the appropriate sanction.


JUSTICE SIMON, also dissenting:

I cannot agree that discipline is warranted in this case, and I therefore dissent.

The record shows that Frank Masters did nothing worse than protect his client, an innocent victim of a criminal extortion, in the only way he believed was realistically available. He advised his client to submit to the demands of an extortionist rather than risk the safety of its employees. At the client's request he agreed to act as a go-between for the purpose of delivering the funds, since the extortionist refused to deal directly with the client. There is nothing in the record to suggest that his conduct was motivated by anything other than a legitimate concern for the safety of his client's employees, as well as his son and himself. As such, he did nothing illegal, immoral or unethical. Under the circumstances, his course of

action may well have been the only reasonable one available. To discipline Frank Masters for his conduct would be to punish a man for refusing to sacrifice the safety of his client's employees for the sake of a pristine professional image.

Although the majority opinion explains the circumstances surrounding the extortion, a little more detail is needed to understand that Masters' conclusion that compliance was the only safe course of action for his client was a reasonable one. When William Griffin, an executive officer of the Hoffman-Rosner Corporation, came to Masters in 1969 and told him of Arambasich's armed threats against his company and its employees, Masters could not have been too surprised. As a former State's Attorney, Masters was fully aware of Arambasich's propensity for violence. He knew, for example, that Arambasich and some fellow members of the ironworkers union had engaged in a "jurisdictional dispute" with members of the carpenters-joiners union at a job site a few years back. Arambasich himself pistol-whipped a carpenter foreman. When Masters tried to persuade the carpenter foreman to prefer charges against Arambasich, the carpenter responded, "Mr. Masters, I'm hurt, but I'm not dead. No, thank you." Masters also knew that, on another occasion, Arambasich and others invaded a construction site armed with clubs. At least one man was severely beaten. Again, out of fear, no one was willing to press charges. The same man was later beaten again. On still another occasion, Arambasich and others appeared at the manager's office of a Mobil Oil Company refinery and shot holes in the ceiling.

Masters' son, who worked summers as an ironworker under the jurisdiction of Arambasich's union, gave him further reason to fear Arambasich. He told his father that he had seen Arambasich at various job sites shouting at contractors or other labor leaders while holding a handgun.

He also told his father that a relative of Arambasich had told him that during World War II, while guarding six POWs, Arambasich shot and killed them all after one of them spit on him.

In my opinion, Masters had every reason to believe Arambasich would make good on his threats. As a former State's Attorney, he was also aware that victims of Arambasich's violence had not always been adequately protected from further violence in the past. In fact, it would be very difficult to guarantee protection to the large group of potential victims in this case. Unfortunately, the law is not always able to act fast enough or effectively enough to protect and reassure victims of extortion, and his professional experience taught Masters to be aware of this shortcoming.

Several witnesses corroborated Masters' impression of Arambasich. One witness testified to an incident involving a confrontation between Arambasich and a building contractor during which Arambasich pulled a gun from his briefcase and said, "Now, let's negotiate."

The Review Board itself noted, "Respondent had a legitimate basis for his fears of retaliation against both his client, himself and his family." This was borne out by the fact that when Masters did come forward to cooperate with the United States attorney in 1974, he received two threats on his life.

The majority, however, seems unwilling to believe that Masters remained silent for four years out of concern for the safety of his client's employees, his son and himself. After assuming *arguendo* that Masters' fear was reasonable at the time of the first payment, my colleagues state that they find it difficult to explain his failure to report the extortion until it had gone on for four years. Immediately after that statement, the majority notes that the evidence presented showed no change of circumstances which

diminished the alleged danger.

The majority's argument can be interpreted two ways. First, although the Administrator may have failed to prove lack of reasonableness initially, the court was not satisfied Masters had reasonable grounds for fear at the time of the later payments. Overlooking questions of burden of proof, if that is the majority's argument, it has answered its own question by noting that circumstances did not change between the first payments and later payments. As far as Masters knew, Arambasich was just as likely to harm someone if the later payments were unpaid as he would have been earlier. Reporting the crime to the police at a later date could very well prove to be an inadequate safeguard.

The majority's argument might also be interpreted to mean that since, in 1974, Masters did report the crime even though circumstances had not changed significantly, the initial assumption that he originally acted out of fear of great bodily harm must be unfounded. If Masters was not originally acting out of fear of great bodily harm to his client's employees, himself and his son, I see no logical explanation for what he did. It obviously did not benefit him in any way to advise and assist his client in handing over money to a man he had been trying to prosecute for years. No evidence was presented that indicates any other motive. Moreover, even a cursory view of the evidence shows his fear was eminently reasonable. The fact that Masters later discontinued the payments and no reprisals occurred is not evidence to the contrary. He decided to test the water. He called Arambasich on the telephone and told him he thought the extortion should stop, and Arambasich agreed. He sensed the danger had played itself out and decided to take the risk. He was lucky, because he was right.

The court is then faced with the question of whether

a charge of a breach of ethics can be sustained under such circumstances.

First it should be emphatically noted that Masters has committed no crime. The majority acknowledges that Masters is not guilty of misprision of felony, as the Federal judge who recommended that his conduct be investigated apparently thought. Misprision of felony requires an affirmative act of concealment. (See *United States v. Daddano* (7th Cir. 1970), 432 F.2d 1119, 1124.) Nor is he guilty of aiding and abetting an intimidation on the grounds that he delivered the funds. Masters was acting on behalf of the victim, and a victim cannot be guilty of aiding and abetting an intimidation. (Ill. Ann. Stat., ch. 38, par. 5–2 & Committee Comments, at 288 (Smith-Hurd 1972).) It would be absurd to hold a person in Masters' position, whose purpose is to protect the victim of an intimidation by acting as a buffer rather than to promote the interests of the extortionist, guilty of aiding and abetting the intimidation, and no one has suggested it.

The majority apparently adopts a rule, based on its interpretation of Rule 1–102(a)(5), that attorneys have a special duty to report or prevent crimes and not to become involved in them in any way that facilitates the crime no matter what their motivation. The nature of this new duty is not completely detailed. It is unclear whether the court considers the advice of silent compliance, or Masters' involvement in the crime as the deliveryman, or both together, to constitute the violation. It is also unclear whether an attorney should report such a crime even over his client's express instructions to the contrary. Careful lawyers are given no guidance. Rule 1–102(a)(5) does not give that guidance. That rule only provides that a lawyer shall not "engage in conduct that is prejudicial to the administration of justice." (79 Ill. 2d R. 1–102(a)(5).) Previously the rule has been applied only in cases in which

the conduct complained of related directly to a pending or contemplated legal proceeding. The majority extends the rule for the first time here.

Whatever the merits of a rule of conduct that requires an attorney to report or prevent any crimes he becomes involved in and prohibits him from facilitating them, it should not be applied in this case. Here the attorney was motivated by his concern for the safety of his client's employees, himself and, for a time, his son. His conduct was based on the reasonable belief that any other course of action would result in serious physical harm to them. Such conduct is not only not blameworthy, it must be encouraged, for however unacceptable we find lawyers who counsel their clients to allow themselves to be victimized, they are considerably more acceptable than attorneys who permit their clients to suffer physical injury. A disciplinary rule that forces an attorney to choose between his innocent client's safety and his career is unrealistic. How should we judge a lawyer counseling the parents of a kidnaped child to pay ransom rather than risk the loss of the child at the hands of a kidnaper who has threatened death if the authorities are notified?

One of the most disturbing aspects of the majority's opinion is the effect it may have on the ability of persons in distress to consult a lawyer. Usually a lawyer is the one person one can expect to be able to speak openly with and be assured of confidentiality. Under the majority's opinion, a person in the position of Hoffman-Rosner could consult anyone he chose for advice on what to do, except a lawyer, because lawyers alone may be required to inform the authorities, regardless of the danger to clients.

The majority cites *In re Rosenthal* (1978), 73 Ill. 2d 46, to support its contention that discipline is warranted here. That case involved the bribery of a public official who told the two lawyers involved that unless they paid

him they would not receive the zoning changes that they believed their client was entitled to. Paying a city official to obtain a zoning change is a criminal offense, and a lawyer may not counsel or assist his client in committing a crime. In contrast, there is nothing illegal about paying someone not to shoot you. In addition, although the lawyers in *Rosenthal* argued that they were forced by threats of violence to comply with the employee's demands, this court found that no threat of any kind occurred until well after the two lawyers had become deeply involved in the extortion/bribery case. Moreover, the court was wholly unconvinced that any real threat occurred at all. The court stated, "[R]equiring the extortionist to produce proof of his misdeeds as a condition of payment does not seem the likely act of individuals acting under duress. Rather, it appears to be the act of persons seeking a guarantee that their client has received the service for which they had bargained." *In re Rosenthal*, in my reading of it, has nothing to say on the critical issues of the instant case.

I would not discipline the respondent here.