(No. 70863.—

# *In re* NICHOLAS ALEXANDER CETWINSKI, Attorney, Respondent.

*Opinion filed May 30, 1991.*

MORAN and CALVO, JJ., took no part.

Christine P. Anderson, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

Gerald W. Shea, Susan M. Coleman and Ira A. Rogal, of Shea, Rogal & Associates, Ltd., of Westchester, for respondent.

JUSTICE CLARK delivered the opinion of the court:

This case comes before us on the reports and recommendations of the Hearing Board and the Review Board. Respondent, Nicholas Alexander Cetwinski, was charged by the Administrator of the Attorney Registration and Disciplinary Commission in a five-count complaint with violating provisions of the Illinois Code of Professional Responsibility. Specifically, the Administrator charged that respondent improperly divided fees for legal services and improperly shared legal fees with a nonlawyer in violation of Disciplinary Rules (DRs) 1—102(a)(5), 2—107(a) and 3—102(a) of the Illinois Code of Professional Responsibility and Supreme Court Rule 771; engaged in illegal conduct involving moral turpitude by preparing and mailing false billing statements to the Village of

Streamwood in violation of DRs 1—102(a)(3), (a)(4) and (a)(5) and Supreme Court Rule 771; engaged in dishonesty, fraud, deceit and misrepresentation by making improper payments to a public official, and improperly sharing fees with that nonlawyer in violation of DRs 1—102(a)(4), (a)(5) and 3—102(a) and Supreme Court Rule 771; engaged in dishonesty, fraud, deceit, and misrepresentation by providing several false statements to government investigators in an attempt to cover up his fraudulent activities in violation of DRs 1—102(a)(4) and (a)(5) and Supreme Court Rule 771; and engaged in illegal conduct by claiming an unlawful payment to a public official as a business deduction on his income tax return in violation of DRs 1—102(a)(3), (a)(4) and (a)(5) and Supreme Court Rule 771. 107 Ill. 2d Rules 1—102, 2—107, 3—102, 771.

The Hearing Board found that respondent was guilty of all the charges set forth in the complaint, and recommended that the respondent be suspended from the practice of law for two years commencing July 31, 1989. The Administrator filed an exception to the recommendation of the Hearing Board, arguing that respondent should be disbarred. The Review Board concurred with the findings of fact, conclusions of law and the recommendation of the Hearing Board. Subsequently, the Administrator filed an exception to the recommendation of the Review Board, asking that the respondent be disbarred. Neither the facts in this matter, nor respondent's guilt, are in dispute. The only issue to be decided is the appropriate sanction to be imposed on respondent.

Respondent was admitted to practice law in Illinois on November 16, 1984. Initially, he was employed at the Illinois State's Attorney's Appellate Service Commission in the newly created labor unit. The labor unit consisted of respondent and his supervisor, Eugene Armentrout. On January 13, 1984, Armentrout was suspended from

the practice of law for two years. (See *In re Armentrout* (1983), 99 Ill. 2d 242.) Respondent learned of Armentrout's suspension during the initial stages of his employment with the labor unit. Respondent earned $1,000 per month for his work at the Appellate Service Commission.

At this time, respondent also began a general solo practice from an office in his home in LaGrange. In 1986, respondent moved his solo practice to an office located at 1105 West Burlington in Western Springs.

In the fall of 1985, Armentrout asked respondent if he would be interested in representing the Village of Streamwood on its labor issues. Armentrout told respondent that in order to be considered for this position, respondent would have to pay Armentrout a referral fee equal to one-third of all fees respondent received from the village. Respondent agreed to pay this referral fee after Armentrout assured respondent that, although he was suspended from the practice of law, Armentrout was an "attorney" and that the referral fee would be appropriate. Subsequently, in November 1985, respondent's services were retained by the Village of Streamwood.

From November 1985 through February 1988, respondent provided legal services to the Village of Streamwood on its labor issues. Respondent's responsibilities included conducting formal and informal contract negotiations with the various unions which represented the employees of the public works, police and fire departments, as well as negotiating unfair-labor-practice charges filed against the various departments. As the village's labor attorney, respondent billed the village at the beginning of each month for services rendered during the prior month at $65 per hour.

From February 1986 through December 1987, respondent issued 13 checks to Armentrout totaling $9,765.04. These payments represented the one-third re-

ferral fee to Armentrout. While these referral fee payments were being made, respondent consulted with Armentrout regarding the matters he was handling for the village. However, Armentrout never assumed any legal responsibility for respondent's services. In addition, pursuant to Armentrout's instructions, respondent never informed the village board that he was paying Armentrout a referral fee.

Furthermore, at the time respondent made the first three referral payments to Armentrout, Armentrout was suspended from the practice of law. The checks issued by respondent to Armentrout on February 3, 1986, February 28, 1986, and March 27, 1986, represented referral fees for respondent's November and December 1985 and January 1986 billings, respectively. During November and December 1985 and until January 13, 1986, Armentrout was suspended from the practice of law.

From November 1985 through February 1988, respondent reported to and worked directly with Edward Emond, the manager of the Village of Streamwood. Respondent needed to obtain the approval of Emond on all negotiations, settlement agreements and contracts prior to their being presented to the village board. Beginning in January 1986, Emond began suggesting to respondent that, since respondent was billing the village for a substantial amount of hours, Emond should be receiving some compensation. Initially, respondent refused to pay Emond and, in fact, pointed out to Emond that he was not an attorney and therefore could not receive a referral fee. However, respondent did agree to make several political contributions at the suggestion of Emond. Thereafter, respondent made four political contributions totaling $800.

Throughout 1986, Emond continued to suggest to respondent that he should be receiving compensation from respondent. Respondent contacted Armentrout for as-

sistance in handling Emond's requests for compensation. In November 1986, Armentrout informed respondent that Emond "was beginning to be a problem and could cause problems with respondent's labor negotiations." As a result, Armentrout suggested that respondent bill the Village of Streamwood for a meeting with Emond at the end of every month, whether or not the meeting actually occurred. Further, Armentrout suggested that respondent take the legal fees received from the village for those meetings and give that amount to Emond prior to deducting Armentrout's one-third referral fee. Respondent agreed to make these payments to Emond.

Beginning in December 1986 and continuing until April 1987, respondent made five payments to Emond totalling $1,212.50. These payments represented the fees respondent received from the village for five purported meetings with Emond. These meetings were itemized on respondent's monthly billings to the village for November 1986 through March 1987.

Respondent's billing statements for the months of November 1986 and January 1987 contained billings for meetings with Emond on November 30, 1986, and January 30, 1987, respectively. These meetings never occurred, and respondent knew that these billing statements were false at the time he mailed them to the Village of Streamwood.

After the April 1987 payment to Emond, respondent unilaterally discontinued making payments to Emond. Respondent discontinued these payments because he knew they were wrong. In addition, respondent stated that while he was employed by the village, he was never physically threatened if payments to Emond or Armentrout were not made. Rather, respondent stated that he made the payments to Emond and Armentrout because he was concerned about losing his contracts with the village and the Appellate Service Commission.

On several occasions, respondent was told by Armentrout and Emond that, if anyone questioned respondent regarding these payments he was making to Emond, respondent should claim that these payments were made in exchange for services rendered by Emond. Subsequently, in December 1987 and on or about February 4, 1988, respondent was contacted by Agent Sam Wojciechowski from the criminal investigation unit of the Internal Revenue Service regarding payments respondent had made to Emond. On both occasions, respondent falsely told Agent Wojciechowski that he had made payments to Emond in exchange for research services rendered by Emond. On February 4, 1988, respondent was served with a grand jury subpoena *duces tecum*. In response to the subpoena, on February 9, 1988, respondent sent a letter to Agent Wojciechowski enclosing the original cancelled checks which respondent had issued to Emond.

In early 1988, several articles detailing respondent's financial relationship with Emond appeared in various newspaper reports. In response to these reports, on February 23, 1988, at the direction of Emond, respondent prepared and submitted a press release entitled "Cetwinski Responds To Streamwood Witch Hunt." In this press release, respondent falsely stated that during the past four years, $1,200 was reimbursed to Emond for private, independent consulting services for the identification of municipalities in need of labor counsel services.

After issuing this press release, on or about February 26, 1988, respondent sent a letter to Emond requesting documentation concerning the costs incurred with respect to Emond's services to respondent between December 1986 and April 1987. In that letter, respondent falsely stated that it was his understanding that a portion of the amounts paid to Emond was for consulting

fees, and the remainder was to compensate Emond for costs incurred.

In early March 1988, respondent consulted with an attorney and thereafter began to cooperate with the Federal government.

On September 22, 1988, respondent was named as a defendant in an indictment filed in the United States District Court for the Northern District of Illinois. Respondent was formally charged in counts XL and XLI with knowingly conspiring with Emond to make an unlawful payment to Emond and claiming the unlawful payment as a business deduction on his income tax return. On September 23, 1988, respondent pled guilty to counts XL and XLI of the indictment. As part of the plea agreement, respondent agreed to continue his cooperation with the Federal government regarding its ongoing investigation of Emond.

On February 2, 1989, respondent was convicted of the aforementioned charges. Respondent's sentence was suspended and respondent was placed on probation for a period of five years on each count to run concurrently. In addition, respondent was required to make restitution to the Village of Streamwood in the amount of $1,200, serve 300 hours of community service, and testify truthfully at Emond's trial. On three separate dates in May 1989, respondent testified for the prosecution in the trial of Emond.

On July 5, 1989, respondent's sentence was reduced by the Honorable James F. Holderman to a period of seven months' probation. In addition, the 300 hours of community service was deleted from the sentence. On July 31, 1989, respondent was suspended from the practice of law by this court pursuant to Supreme Court Rule 761.

As noted earlier, respondent has acknowledged that he is guilty of essentially all of the allegations of wrong-

doing in the complaint. Thus, the only issue to be decided is the appropriate sanction for respondent. The Hearing Board and the Review Board both recommended that respondent be suspended from the practice of law for two years commencing on July 31, 1989. The Administrator contends that disbarment is the appropriate sanction. We believe that respondent should be suspended from the practice of law for three years commencing on July 31, 1989.

We certainly give due deference to the recommendations of the Hearing Board and the Review Board as to the appropriate sanction for a respondent. However, the final responsibility for making this determination rests with this court. (*In re Topper* (1990), 135 Ill. 2d 331.) The purpose of attorney disciplinary cases is not to punish the attorney, but " 'to maintain the integrity of the legal profession, to protect the administration of justice from reproach, and to safeguard the public.' " (*In re Armentrout* (1983), 99 Ill. 2d 242, 253, quoting *In re La Pinska* (1978), 72 Ill. 2d 461, 473.) Each disciplinary case is unique and must be evaluated based on the particular set of facts presented. (*In re Leonard* (1976), 64 Ill. 2d 398, 404.) Nonetheless, predictability and fairness require that there be reasonable consistency in the sanctions imposed for similar types of conduct. (*In re Saladino* (1978), 71 Ill. 2d 263, 275; *In re Clayter* (1980), 78 Ill. 2d 276, 283; *In re Levin* (1979), 77 Ill. 2d 205, 211.) In determining the appropriate sanction, we will consider the relevant factors in aggravation and mitigation. *In re Lidov* (1989), 129 Ill. 2d 424, 430.

In this matter, there is no question that respondent engaged in serious misconduct which brought the legal profession into disrepute. In addition to paying improper referral fees to Eugene Armentrout, respondent knowingly paid money to the public official responsible for approving all of the negotiations, settlement agreements

and contracts prior to their presentation to the village board. Respondent submitted inflated billing statements to the Village of Streamwood and consequently received unearned fees. Moreover, respondent initially gave false statements on two occasions to Federal authorities investigating his participation in a scheme to defraud the Village of Streamwood, and he issued a false press release to the public denying any wrongdoing on his part.

Respondent was convicted of knowingly conspiring with Emond to make an unlawful payment to Emond, and claiming the unlawful payment as a business deduction on his income tax returns. As a result, respondent engaged in a crime involving moral turpitude. (See *In re Scott* (1983), 98 Ill. 2d 9, 16.) In addition, the Hearing Board found that respondent engaged in illegal conduct involving moral turpitude by committing mail fraud. Relying primarily on *In re Rosenthal* (1978), 73 Ill. 2d 46, the Administrator argues that disbarment is the appropriate sanction for respondent's misconduct. In *Rosenthal*, two attorneys allowed their client to pay $20,000 to a government official after the official arranged to have the client's zoning variance denied. Subsequently, the zoning variance was approved. The government official was eventually convicted of extortion and the two attorneys testified against him pursuant to a grant of immunity. In their disciplinary proceeding, the attorneys claimed they did not withdraw from the case and disclose the crime because of fear of economic, political and physical reprisal against themselves and their client. We held that the two attorneys discredited the integrity of the bar and impeded the administration of justice, and thus they should be disbarred. *Rosenthal*, 73 Ill. 2d at 56.

Although respondent's misconduct is similar to that of the the two attorneys in *Rosenthal*, we believe that mitigating evidence demonstrates that a three-year sus-

pension is the appropriate sanction for respondent. Initially, we note that respondent unilaterally discontinued the improper payments to Emond prior to any government investigation. From the beginning, respondent has expressed his remorse for his misconduct. Further, as part of his sentence, respondent suggested that restitution to the Village of Streamwood be required. Immediately after his sentencing, respondent made restitution to the Village of Streamwood in the amount of $1,200. Notwithstanding the misconduct under review here, the Hearing Board concluded that respondent has a "flawless reputation in the community for honesty and integrity." Shortly after being admitted to the practice of law in November 1984, respondent independently began a *pro bono* program to provide free legal services to senior citizens. From early 1985 until his suspension in July 1989, respondent conducted seminars and lectures to senior citizen groups in the areas of wills, trusts, and estate planning. At the time respondent agreed to make payments to Emond, his marriage of 10 years was failing and ultimately ended in divorce. The Hearing Board stated that respondent's failing marriage "preoccupied, distracted, and impaired respondent's mental state."

In addition, respondent not only testified truthfully three times in the trial of Emond, but respondent agreed to covertly wear a body wire to record a conversation with Emond. Judge Holderman reduced respondent's sentence to a period of seven months' probation, and deleted the 300 hours of community service. In so doing, Judge Holderman stated:

> "I believe [respondent] testified truthfully. I also believe that [respondent] was a victim of extortion ***. I truly believe that [respondent] will never be before any court as a criminal defendant again in his life."

An attorney should be disciplined for participating in an extortionate activity. (See *In re Topper* (1990), 135 Ill.

2d 331, 344.) Given the mitigating evidence in this matter, we believe that respondent should be suspended from the practice of law for three years commencing on July 31, 1989.

*Respondent suspended.*

JUSTICES MORAN and CALVO took no part in the consideration or decision of this case.