**UNITED STATES of America, Plaintiff-Appellee,**

v.

**William DADDANO et al., Defendants-Appellants.**

**Nos. 17283, 17340.**

United States Court of Appeals, Seventh Circuit.

Oct. 1, 1970.

Rehearings Denied Dec. 2, 1970.

---

Raymond J. Smith, Anna R. Lavin, George F. Callaghan, John J. Cogan, Chicago, Ill., Richard Cain, Texarkana, Tex., for defendants-appellants.

William J. Bauer, U. S. Atty., Michael B. Nash, Asst. U. S. Atty., Chicago, Ill., Thomas A. Foran, U. S. Atty., Chicago, Ill., for plaintiff-appellee; John Peter Lulinski, William Allen, Asst. U. S. Attys., of counsel.

Before FAIRCHILD and CUMMINGS, Circuit Judges, and GRANT, District Judge.[1]

FAIRCHILD, Circuit Judge.

These are appeals by five defendants from judgments entered upon guilty verdicts after a joint trial.

The evidence, when conflicts are resolved and permissible inferences drawn consistently with the verdicts, presents an unusual story, which we now, in outline, recount. The names of the present defendants are italicized.

On September 17, 1963, Michael La Joy, his uncle, *Frank De Legge, Sr.*, Joseph D'Argento, and Larry Fletcher were driving home to Chicago from Detroit. They began to talk about robbing the Franklin Park Bank in Franklin Park, Illinois, where *De Legge, Sr.* lived. The plans for the venture were developed at several later conversations in various places. The robbery was carried out shortly before noon on September 23.

There were several additions to and defections from the group. La Joy, D'Argento, Gerald Tomaszek, and Guy Mendola entered the bank. Patrick Schang was the driver and remained in the stolen automobile in which the group reached and left the bank. They had just come from the home of *De Legge, Sr.*, on Manor Drive. *De Legge, Sr.* and *Frank De Legge, Jr.* had participated in the planning and had assisted in various preparations. *De Legge, Sr.* had suggested that after the robbery the group should go to a vacant house on Dora street which he owned and which was for sale. The car could be driven into the attached garage and the robbers could leave, presumably without drawing attention to themselves.

At the time of the robbery, *De Legge, Sr.* remained in his car near the bank. He had agreed to attempt to collide with a police car if that became necessary to aid in the getaway. The robbery was timed so that a freight train would be passing on a track just north of the bank and forming a barrier between the bank and the Franklin Park police sta-

---

1. Chief Judge Grant of the Northern District of Indiana, is sitting by designation.

tion, north of the track. *De Legge, Jr.* had agreed to, and did, make a telephone call to the police station before the train arrived. He gave false information concerning a bomb in a school farther north, hoping to decoy the police in that direction.

Unfortunately for the robbers, *De Legge, Jr.'s* telephone call was too late to be useful, virtually coinciding with the alarm from the bank. Squad cars were dispatched promptly. The train was shorter than expected, and by driving on the sidewalk the police were able to get around the caboose and give immediate chase. *De Legge, Sr.* failed to produce a collision.

Schang, the robbers' driver, was able, however, to lose his pursuers. He drove to the Dora street house and put the car in the garage. The men left the money, disguises and other equipment in the house, and departed on the run. Considerable commotion had been caused, however, by high speed, squealing tires, and flying gravel, and a series of mishaps, including the unforeseen presence of a garbage truck in the alley through which they drove. The men were seen by one or more neighbors. A short time later the police arrived, found the car, and searched the house.

There had been an interval, however, in which the *De Legges* had come to the house, hidden the discarded items, and removed the money. Questioned later, they apparently satisfied the police or FBI agents that they were not involved with the robbers nor the use by the latter of *De Legge Sr.'s* vacant house.

In some manner La Joy, D'Argento, Tomaszek, and Schang promptly became suspects. On September 26, these four were indicted. They were arrested, but freed on bail October 3. *De Legge, Sr.* had taken some of the bank money and paid it to *Rocco Montagna*, a professional bondsman, who arranged for the bonds. *De Legge, Sr.* told La Joy and D'Argento in *Montagna's* presence that the money had come from proceeds of the robbery.

A question arose why Mendola, who had been a participant, had not been indicted. Later Schang began to suspect that La Joy might have informed the police. Schang told *Montagna* of his suspicions. He was wary, however, because La Joy was the nephew of *William Daddano*. The evidence demonstrated that *Daddano* was one who spoke with a voice of authority in such matters. He is also *De Legge ,Sr.'s* brother-in-law and the uncle of both La Joy and *De Legge, Jr. Montagna* took Schang to *Daddano*.

*Daddano* decided that the participants would take lie detector tests, and that if anyone failed the test, the others could shoot him if they wished. Accordingly, in response to word from *Montagna*, La Joy, Schang, D'Argento, and Tomaszek met *Montagna* and *Daddano* at a bowling alley in the latter part of October. *Montagna* took the participants across the street to a motel. They went into a room one by one and were given a polygraph test by William Witsman. Witsman was then a detective in the Special Investigations Unit in the office of the sheriff of Cook county. The unit was headed by Chief Investigator *Richard Cain*. Witsman attached the apparatus to each man, asked and twice repeated a list of questions, recorded the answers, removed each man's chart from the machine and handed it to *Montagna*. One of the questions was whether the man had given truthful information to a law enforcement agency.

*Montagna* delivered the charts to *Daddano*. A day later, in *Daddano's* presence, *Montagna* told the men they had passed.

Witsman testified that *Cain* had given him a list of the questions, told him to go to the motel, to give the tests to men who would be produced by a man he would meet there, not to interpret the charts, but to give them to the same man.

Some time later *Cain* directed Witsman to go to another address and administer similar tests to others. At the address was *Montagna's* home, and the

men tested were the *De Legges* and Mendola. Months later Witsman was disturbed by a news story which contained Schang's picture and by recognizing Schang as one of the men he had tested. Witsman telephoned *Cain*. *Cain* said not to worry about the charts because he had flushed them down the toilet.

Although no witness except Witsman described *Cain's* participation, the jury could properly infer from the circumstances, as it did, that *Daddano* must have explained his problem to *Cain* and that *Cain* had arranged the tests and interpreted the charts with knowledge of the circumstances and their purpose.

La Joy, Schang, D'Argento, and Tomaszek were tried for the bank robbery in 1965 and convicted. Some of them had testified in their own behalf, giving exculpatory and now admittedly perjured testimony. They received substantial sentences. La Joy, Schang, and D'Argento have been convicted of or charged with other offenses and face possible additional sentences. At various times in 1967 these three decided to give information to the government. Probably their cooperation with the government will help them, and they have much at stake. The government has given money to the families of La Joy and D'Argento in return for information received. In 1967 the indictment now under consideration was returned against the *De Legges, Montagna, Daddano,* and *Cain*. Mendola is deceased. The trial now under review occurred in September, 1968, and La Joy, Schang, and D'Argento testified to many of the facts set forth in the foregoing narrative.

There can be no real challenge to the sufficiency of the evidence to support the facts just narrated. The story is, indeed, unusual. But the testimony was not inherently incredible. The jury was fully informed of the circumstances which bore upon the credibility of La Joy, D'Argento, and Schang, including their interest in recognition by the government of their cooperation, but the jury believed them. The jury also believed Witsman, and drew inferences as to *Cain's* guilty knowledge and intent which the jury was entitled to draw. We do not consider it necessary to set forth a detailed analysis of the supporting evidence.

We proceed to deal with the various attacks upon the indictment as matters of law, the claims that the facts narrated do not add up to guilt of the offenses charged, and claims of error in procedure and at trial.

Count 2 charged the *De Legges* with bank robbery [2] "together with" the other five participants. It further charged that they put lives in jeopardy by the use of dangerous weapons,[3] but the jury found them guilty only of the lesser offense. Counsel challenges the sufficiency of the evidence to support the verdict, apparently on the basis that what the *De Legges* did was short of "participation." *De Legge, Sr.'s* standing by in his car to protect the getaway, though he failed, and *De Legge, Jr.'s* telephone call to the police would qualify, it seems, as "participation", if that is meaningful and important, but the government proved other acts of aiding, abetting, and counselling the offense, making the *De Legges* punishable as principals under 18 U.S.C. § 2 in any event.

### I. *Challenges to the indictment.*

Counts 1 (conspiracy), 3 (accessory after the fact), and 4 (misprision of felony) charged *Daddano, Montagna,* and *Cain*. (Varelli, not on trial, was also charged in counts 1 and 4.)

Count 4 [4] charged that defendants, having knowledge of the actual commission of the bank robbery by the seven participants, "concealed, and did not as soon as possible make known the same to

---

2. 18 U.S.C. § 2113(a).

3. 18 U.S.C. § 2113(d).

4. Misprision of felony, 18 U.S.C. § 4.

some judge or other person in civil authority under the United States, * * *." After completing the charge in the words of the statute, the indictment specified that defendants caused lie detector tests to be administered in order to determine whether certain persons were furnishing information concerning the bank robbery and the perpetrators thereof to governmental authorities lawfully investigating the same.

Count 3[5] charged that defendants, knowing of the bank robbery by the seven participants, received, relieved, comforted, and assisted them in order to hinder and prevent their apprehension, trial and punishment. In addition to charging in the words of the statute, the indictment specified that the assistance for such purpose was given by causing the lie detector tests to be administered in order to determine whether certain persons were furnishing information about the robbery and the participants to governmental authorities.

Count 1[6] charged defendants, in substance, with conspiring to commit the offenses charged in counts 3 and 4, in each case by means of the lie detector tests for the purposes described in those counts. Eight overt acts were alleged (and proved).

Defendants argue that misprision of felony is not sufficiently alleged unless a particular act of concealment is specified, and that the giving of lie detector tests to determine whether certain persons were furnishing information to the authorities is not an act of concealment. Defendants rely upon Bratton v. United States[7] holding (1) that 18 U.S.C. § 4, defining misprision, requires an affirmative act of concealment in addition to failure to disclose the felony to the authorities, and (2) that an indictment merely alleging concealment was insufficient. We agree with (1).[8] We agree, however, with a later decision in the tenth circuit, that an indictment simply using the words of the statute and alleging concealment and failure to make known is sufficient.[9] In any event, the giving of the lie detector test was an affirmative act, alleged in the indictment, and although the nexus between the determination of who was giving information to the authorities and the accomplishment of the concealment was not spelled out, it could readily be inferred.

At trial there was evidence which tended to prove that defendants intended that anyone found to have furnished information to the authorities would be silenced, and that the entire procedure and accompanying threats (even on the assumption the tests were only simulated and were not adequate for a qualified examiner to state an opinion) were intended to emphasize to all participants the desirability of withholding information from the authorities.

Of course, at the time the lie detector tests were given, the authorities had enough information about the participation of four men to have had them indicted. It has been held that it is unimportant whether the government did or did not know of the principal crime or who the perpetrator was before the person charged with misprision took affirmative steps to conceal the crime.[9a] Even if, however, suppression of testimony against the already indicted defendants would not constitute misprision, the felonies committed by the *De Legges* and Mendola had not yet become known to the authorities. The administration of the tests, in the aura of intimidation, concealed for the time being the felonies committed by the latter three, even though the fact of the rob-

---

5. Accessory after the fact, 18 U.S.C. § 3.

6. Conspiracy, 18 U.S.C. § 371.

7. (10 Cir., 1934), 73 F.2d 795.

8. Neal v. United States (8th Cir., 1939), 102 F.2d 643; see 21 Am.Jur.2d Criminal Law § 7, pp. 87–88.

9. Sullivan v. United States (10th Cir., 1969), 411 F.2d 556.

9a. Lancey v. United States (9th Cir., 1966), 356 F.2d 407.

bery was well known and the participation of the other four sufficiently so.

█ Defendants contend that the misprision statute must not be applied to them because it would compel them to be witnesses against themselves. The theory is that if they reported their information about the bank robbery as soon as they received it, they could reasonably fear that the information could lead to their own conviction of being accessories after the fact or some other related offense. This is particularly urged by *Montagna,* who knowingly received part of the stolen money. Defendants rely on United States v. King [10] which appears to support their claim, at least in dictum. We think the answer to this argument and, with all respect, to that holding of *King,* is that the offense of misprision as defined in 18 U.S.C. § 4 consists of an act of concealment in addition to failure to disclose. Thus the statute does not purport to punish one solely for failure to report facts which he has reasonable fear might lead to his conviction of crime.

█ It appears that none of the bank robber witnesses testified before the grand jury which returned the indictment in this case. Presumably the grand jury were apprised of what they knew by investigative reports or similar hearsay. Defendants note the second circuit criticism of this practice.[11] Part of the theory is that if a witness who testifies against a defendant at trial did not testify before the grand jury, there is no transcript of grand jury testimony to use in attempting impeachment. But the reasons for permitting use of prior testimony, if it exists, to impeach trial testimony do not, it seems to us, compel the creation of prior testimony so that it can be so used. The fifth amendment requirement of indictment by a grand jury is not violated where "all the evidence before the grand jury was in the nature of 'hearsay'." [12]

The *De Legges* are charged only in count 2 and the other three in counts 1, 3, and 4. All claim improper joinder of defendants.

Rule 8(b), F.R.Cr.P., authorizes joinder of two or more defendants if they are alleged to have participated in the same transaction or in the same series of transactions constituting offenses.

█ The robbery of the bank, and the set of events surrounding the lie detector tests are very closely related. The supposed need for the lie detector set of events grew out of the bank robbery. They were, in a sense, designed for the benefit and protection of the *De Legges* and other alleged robbers. They followed the robbery in a short period of time. In order to prove the offenses allegedly arising out of the lie detector events, it was essential to prove the bank robbery. It may be reasonable, for the purposes of Rule 8(b), to consider both sets of events as parts of one transaction. But even if each set of events be deemed a separate transaction, we think the relationship is close enough that they may be deemed a "series" under Rule 8(b). In either event the participants in one set of events may be joined as defendants with the participants in the other.

In United States v. Scott [13] this court held that three defendants could properly be joined in one indictment charging three of them with one theft, two with a different theft, and one with a third. The three thefts were deemed a series of transactions under Rule 8(b) on the ground that they were part of a common plan. The pattern of events considered in *Scott* is different from the one at hand, and we do not consider the common plan test applied in *Scott* as exclusive. Rule 1.2 of the ABA Standards Relating

10. (9th Cir., 1968), 402 F.2d 694.

11. United States v. Arcuri (2d Cir., 1968), 405 F.2d 691, 694, and cases cited therein.

12. Costello v. United States (1956), 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397; United States v. Braico (7th Cir., 1970), 422 F.2d 543, 545.

13. (7th Cir., 1969), 413 F.2d 932.

to Joinder and Severance, quoted in part in *Scott*, not only permits joinder of defendants where the several offenses were part of a common scheme or plan, but also where they "were so closely connected in respect to time, place, and occasion that it would be difficult to separate proof of one charge from proof of the others." (Rule 1.2(c)(ii).)

Precise, inelastic codification of the situations where joinder is reasonable and not unfair is extremely difficult. We think joinder was reasonable here.

■ Defendants also moved for severance under Rule 14, F.R.Cr.P., "Relief from Prejudicial Joinder". We find no abuse of discretion in the denial of their motions.

II. *Denial of Continuance because of pretrial publicity.*

■ Some of the defendants sought a continuance or transfer of this case because prejudicial publicity had occurred or was anticipated.

In 1963 when the bank robbery and lie detector events occurred, *Cain* was chief investigator of the Special Investigations Unit under the sheriff of Cook county. The present indictment was filed March 5, 1968, superseding an indictment filed against *Cain* later in 1967. The trial occurred in September, 1968. The 1968 campaign for governor was under way, the election would be held in November, and one of the principal candidates for governor had been sheriff when *Cain* was chief investigator. Public comment was made from time to time during the campaign about *Cain's* indictment.

Defendants' argument was that these facts did and would increase the amount of publicity before and during trial, and that a continuance or transfer was required. The district court denied the motions.

Newspaper stories were placed in the record. We readily assume that considerable publicity was and would be generated by a charge that an intermediary for bank robbers called on the sheriff's office for help in finding out which robber was squealing to the police; and that a highly placed enforcement officer arranged for lie detector tests to be given to assist in the inquiry. Political campaigners doubtless tried to use this material to advantage. Stories reporting the trial appeared daily.

But overall the quantity of publicity in the record is not impressive when the size of the metropolis is considered. The newspapers were very far from being saturated and nothing is shown with respect to other media.

The ultimate question is whether it is possible to select a fair and impartial jury, and in most situations the *voir dire* examination adequately supplies the facts upon which to base that determination.[14]

When the jury was being selected here, only four prospective jurors indicated bias, one of them saying he could not keep an open mind because of exposure to publicity. All were excused. We are not persuaded that it was an abuse of discretion to proceed with the trial in Chicago in September.

III. *Publicity during trial.*

The jury was selected September 9 and 10, 1968. The trial began September 11 and the case submitted to the jury October 1. Until the latter date, the jury was permitted to separate.

On September 9, the trial judge explained to all the prospective jurors the necessity that a juror decide the case only upon the evidence presented in open court and avoid conversation and exposure to reports about the case. He ordered each one, even more broadly, "not

14. Margoles v. United States (7th Cir., 1969), 407 F.2d 727; Blumenfield v. United States (8th Cir., 1960), 284 F.2d 46, 51; Jones v. Gasch (D.C.Cir., 1967), 404 F.2d 1231, 1239, cert. den. 390 U.S. 1029, 88 S.Ct. 1414, 20 L.Ed.2d 286. But see Commentary, ABA Standards Relating to Fair Trial and Free Press pp. 54–67, suggesting limitations on the effectiveness of *voir dire.*

to read any newspapers or any other journal, not to listen to the radio or to look at or listen to television programs". He meticulously repeated this order before each recess, so that on the 15 days on which the jurors were present, the order was given 46 times.

From time to time defense counsel brought newspaper stories to the attention of the judge, and requested that he question the jurors to determine whether any had read them and what prejudicial effect they may have had. The judge declined to do so, pointing to the order so explicitly and frequently given and relying upon the presumption that the order had not been violated.

More than 50 clippings from four Chicago newspapers are in the record. Some evidently appeared on the front page, many do not indicate the page, and many were on other pages. Only one full width headline appeared on the front page. It clearly did not go beyond the record.

In the main the stories reported the progress of the trial including claims made and evidence advanced by various defendants as well as the prosecution. Some of the stories, however, included material beyond the record, of which the jury should not be informed. There were several inaccurate statements which would have readily been recognized by the jury as mistakes. There were references to several of the defendants in terms indicating underworld or other criminal activity. The fact that Mendola was dead was known to the jury. Defense cross-examination of one witness had suggested the witness may have been involved in Mendola's murder, but a number of the news stories described Mendola's death by shotgun and suggested that he had been killed because of his failure to pass the lie detector test. This did not appear in the heading of any story. Three stories on one day referred to government witness D'Argento's belief that his life was threatened by a Chicago organization, and the headings of these stories so reflected. They were not on the front page. D'Argento had testified on cross-examination that his life had been threatened, and although the judge struck the answer, the jury had heard it. It appeared that defense counsel who asked the question had reason to anticipate the answer.

There can be no question but that if it were shown that a juror had read the items going beyond the record, particularly those referring to Mendola's death and those calling the defendants gangsters and the like, further inquiry with respect to their effect upon him would be required.

The practice followed in this trial, occurring in September, 1968, clearly does not comply with the pronouncement of this court several months later on March 4, 1969, in Margoles v. United States: [15]

"Thus, the procedure required by this Circuit where prejudicial publicity is brought to the court's attention during a trial is that the court must ascertain if any jurors who had been exposed to such publicity had read or heard the same. Such jurors who respond affirmatively must then be examined, individually and outside the presence of the other jurors, to determine the effect of the publicity. However, if no juror indicates, upon inquiry made to the jury collectively, that he has read or heard any of the publicity in question, then the judge is not required to proceed further."

This court had not propounded a similarly comprehensive rule in earlier decisions.

The court's desision in 1962, reversing a conviction in United States v. Accardo [16] was based upon its "special facts", which are readily distinguishable from the present case. The Accardo trial lasted more than eight weeks, front page headlines carried prejudicial material and the trial judge gave his orders not to read about the trial only at the beginning of the selection of the jury.

---

15. (7th Cir., 1969), 407 F.2d 727, 735.

16. 298 F.2d 133.

He declined, as here, to poll the jury when prejudicial publicity was brought to his attention.

Viewing the special facts of the instant case, tried before our pronouncement in *Margoles,* we think the trial judge could reasonably presume that jurors followed the orders so carefully and frequently given, and that they neither intentionally read the stories nor had prejudicial material forced upon them.

We acknowledge that shortly after the decision in *Margoles,* this court reversed a pre-*Margoles* conviction in United States v. Palermo.[17] There the same trial judge had given similar careful and frequent admonitions. It was held, however, that such admonitions could not be relied upon where prejudicial publicity was brought to his attention, and that he must question the jury to ascertain whether any had read or heard it. That was said, however, in a case where, although opinion does not detail it, headlines would virtually force the prejudicial material on a juror attempting to avoid it. We do not deem it controlling here. Cf. United States v. Solomon (7th Cir., 1970) 422 F.2d 1110, 1118–1119, cert. denied sub nom. Sommer v. United States, 399 U.S. 911, 90 S.Ct. 2201, 26 L.Ed.2d 565.

IV. *Restriction of cross-examination.*

■■■ La Joy, D'Argento, and Schang were extensively cross-examined. In each case defense counsel brought out many facts which might damage credibility: convictions of crimes, pendency of outstanding charges, perjury in other trials, exposure to long sentences, hope for leniency from the government, refusal to talk with defense counsel, payment of money by the government to the wives of La Joy and D'Argento in return for information supplied by the husbands.

Defense counsel claim error under Alford v. United States[18] and Smith v.

Illinois.[19] La Joy testified he was serving his sentence and in the custody of the marshal, but that he was no longer in the penitentiary. The court sustained objections to questions seeking to learn where he was then living. Schang testified that after a period in jail he had been released on bond and was still allowed to be free on bond. He testified that he is employed. Objections were sustained to questions as to the identity of his employment and where he was living.

We think that although the particular questions are literally the kind with which *Alford* and *Smith* deal, defense counsel had nevertheless been afforded "the opportunity to place the witness in his proper setting". Under the circumstances the trial judge did not abuse his discretion. The harassment or danger to which an answer would probably expose Schang, at least, was implicit in the situation and in view of the admissions already before the jury it is hard to imagine that the answers would have added or led to any significant material bearing upon the credibility of the witnesses.

Other claims of undue restriction on cross-examination relate to situations where counsel brought before the jury much of the substance of what he wanted to show. Each claim ultimately collides with either the proposition that the court did not abuse his discretion in stopping inquiry where he did, or that if there was error, it was harmless.

V. *Other claims.*

Numerous other arguments are advanced, including allegedly undue limitation of argument by defense counsel and allegedly unrestrained excesses in argument by the government. *Cain* argues several other points, including the proposition that his subpoenaes requiring the IRS to produce income tax returns of government witnesses should not have been quashed.

17. (7th Cir., 1969), 410 F.2d 468, 471.

18. (1931), 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624.

19. (1968), 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956.

We have examined all these arguments and are satisfied that no reversible error has been shown.

### VI. *Daddano's challenge to his consecutive sentences.*

*Daddano* was sentenced to five years on count 1, seven years on count 2, and three years on count 4. The terms are consecutive and cumulative fines were imposed. He argues that these are all sentences for the same act of giving a lie detector test and are illegal.

 It is well settled that consecutive and cumulative penalties may be imposed for separate offenses. "The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not." [20]

 It is readily apparent that the offense of conspiracy is distinct from the other two, since it must be proved that two or more conspired, but need not be proved that a substantive offense was completed.

 Whether misprision and being an accessory after the fact are distinct from each other seems a closer question. Probably most instances of misprision involve, in actuality, being an accessory after the fact. Comparing the statutes literally, however, 18 U.S.C. § 3 (accessory after the fact) requires a purposeful relationship between the acts of the accessory and the principal offender. The accessory must receive, relieve, comfort or assist the principal offender in order to hinder or prevent his apprehension, trial or punishment. 18 U.S.C. § 4 (misprision) requires concealment of the commission of the felony, a fact not necessarily required by § 3, but does not re-

quire an intent to benefit the principal offender, although such benefit usually results. We conclude the offenses are distinct for the purpose of imposing cumulative penalties.

The judgments appealed from are affirmed.

---

**20.** Blockburger v. United States (1932), 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306; United States v. Noble (3rd Cir.. 1946), 155 F.2d 315, 318; Newman v. United States (6th Cir., 1954), 212 F.2d 450; Gore v. United States (1957), 100 U.S.App.D.C. 315. 244 F.2d 763; Dear Wing Jung v. United States (9th Cir., 1962), 321 F.2d 73, 75; United States v. Barnett (6th Cir., 1969), 418 F.2d 309, 312.