NOT RECOMMENDED FOR PUBLICATION
File Name: 14a0734n.06

No. 13-5580

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Sep 24, 2014
DEBORAH S. HUNT, Clerk

UNITED STATES OF AMERICA,                )
                                         )
          Plaintiff-Appellee,            )
                                         )
v.                                       )   ON APPEAL FROM THE UNITED
                                         )   STATES DISTRICT COURT FOR THE
                                         )   EASTERN DISTRICT OF TENNESSEE
RICHARD R. BAUMGARTNER,                   )
                                         )
          Defendant-Appellant.           )


Before: BOGGS and CLAY, Circuit Judges; COHN, District Judge.[*]


BOGGS, Circuit Judge. Defendant Richard Baumgartner, a former Tennessee Criminal Court judge, was indicted on seven counts of misprision of felony, in violation of 18 U.S.C. § 4. The federal misprision statute provides: "Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both." The indictment charged that Deena Castleman and others "were participants in a conspiracy to obtain and distribute quantities of controlled substances," that Baumgartner was aware of the conspiracy, that Baumgartner made material misrepresentations about Castleman to other

---

[*] The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

individuals that effectively concealed the conspiracy, and that Baumgartner failed thereafter to notify federal authorities of the conspiracy.

The district court granted Baumgartner's motion for judgment of acquittal with respect to Count 3 only, and the jury convicted Baumgartner of Counts 1 and 4–7 and acquitted him of Count 2. On appeal, Baumgartner argues that his conviction was improper because his "non-commercial, private speech . . . to local officials [and] private citizens" does not qualify as "concealment" under the federal statute. Appellant's Br. at 27. He also argues that the misprision-of-a-felony statute would exceed Congress's authority under the Commerce Clause if construed to cover his conduct; that the statute violates the First Amendment as applied to his conduct; that the evidence at trial was insufficient to support his convictions; and that the district court's instructions to the jury were so defective that they deprived him of his right to a fair trial. We affirm Baumgartner's conviction as to Counts 4 through 7 and reverse and vacate his conviction as to Count 1.

**I**

In 1992, Baumgartner became a judge on the Knox County Criminal Court, which is the state felony trial court in Tennessee. From 2000 to 2011, Baumgartner also presided over the Knox County Drug Court, which was developed as an alternative to incarceration to provide nonviolent offenders with substance-abuse treatment and job training. One of the offenders who came before him in drug court was Deena Castleman. She completed the program successfully from 2003–2005 but was back in the drug court in 2007. This time Castleman fared poorly and was terminated from the program.

In 2009, Baumgartner invited Castleman to his chambers and asked her if she could procure hydrocodone for him. Castleman said yes. Baumgartner gave her $175 for the pills, but

Castleman ended up using the money to purchase drugs for herself. She was arrested for possession and incarcerated in neighboring Anderson County on May 27, 2009. Castleman wrote Baumgartner about her legal predicament, and Baumgartner called his friend and colleague, Judge Donald Elledge of the Anderson County Criminal Court and Anderson County Drug Court, to speak with him about Castleman. According to Elledge, Baumgartner said that Castleman "had been in his drug court and that he felt she would be a good drug court candidate." This conversation forms the basis for Count 1 of the indictment. Ultimately, Castleman did not apply for the drug-court program; she pleaded guilty pursuant to a plea agreement with the prosecution and was sentenced to three years' probation.

While Castleman was on probation, Baumgartner continued to give her money to procure pills for him. Baumgartner bought her a cellphone to facilitate the transactions. The two also became involved in a sexual relationship. Castleman at times mentioned to Baumgartner the identities of her suppliers and eventually introduced him to a supplier named Chris Gibson, with whom Baumgartner began dealing directly.

Castleman soon found herself facing criminal charges in Knox County for aggravated burglary and was scheduled for a preliminary hearing before Judge Andrew Jackson of the Knox County General Sessions Court in February 2010. Judge Jackson testified that, prior to the hearing, Baumgartner came to speak with him about Castleman:

> I was on my way to court, and I was approached by Richard Baumgartner, who said he had this woman who was in drug court, was doing very well, was turning her life around, and that she picked up some new charges. He didn't think these charges were any good and wanted me to take a look at the case.

This conversation forms the basis for Count 4 of the indictment.

Two months later, Baumgartner tried to arrange for Castleman to stay at the YWCA's transitional housing unit. When the YWCA housing director suspected that Castleman was on

3

drugs, he directed that she be tested. Baumgartner tried to assist Castleman in her effort to use someone else's urine sample. When that sample tested positive for drug use, Baumgartner called the housing director and said that Castleman had actually passed the drug test. The director did not believe Baumgartner and did not admit Castleman into the housing unit. Baumgartner's conduct and statement form the basis for Count 5 of the indictment.

Baumgartner also lied to Tennessee Juvenile Court Magistrate Judge Stan Briggs, who issued a warrant for Castleman's arrest for contempt for failure to pay child support. In August 2010, Baumgartner told Briggs that he was "working with" Castleman in criminal court, and Briggs therefore vacated the arrest warrant and released Castleman on her own recognizance. Baumgartner's conversation with Briggs forms the basis for Count 6 of the indictment.

Finally, in October 2010, Baumgartner spoke about Castleman to Jeffrey Blevins, the assistant district attorney who was prosecuting her for burglary, larceny, drug, and DUI charges, the exact nature of which is unspecified in the record. As Blevins put it, Baumgartner said that Castleman was or had been in his drug court, "what a fine drug court person she was, she was having a little bit of trouble, and that he would like me to do for her what I could. And I was somewhat surprised at that." This conversation forms the basis for Count 7 of the indictment.

## II

"Whether a criminal statute applies to the proven conduct of the defendant is an issue of statutory interpretation that we review de novo." *United States v. Miller*, 734 F.3d 530, 539 (6th Cir. 2013). "The language of the statute is the starting point for interpretation, and it should also be the ending point if the plain meaning of that language is clear." *Id.* at 540. "However, this court also looks to the language and design of the statute as a whole in interpreting the plain meaning of statutory language." *Ibid.* "Finally, we may look to the legislative history of a

4

statute if the statutory language is unclear." *Ibid.* "If the statute remains ambiguous after consideration of its plain meaning, structure, and legislative history, we apply the rule of lenity in favor of criminal defendants." *Ibid.*

18 U.S.C. § 4 provides: "Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both." This court has construed the statute as being comprised of four elements, each of which must be proven beyond a reasonable doubt to sustain a conviction against a defendant: "(1) the principal committed and completed the felony alleged; (2) the defendant had knowledge of the fact; (3) the defendant failed to notify the authorities; and (4) the defendant took affirmative steps to conceal the crime of the principal." *United States v. Goldberg*, 862 F.2d 101, 104 (6th Cir. 1988). "Mere knowledge of the commission of the felony or failure to report the felony, standing alone, is insufficient to support a conviction for a misprision of a felony." *Ibid.* But concealment need not consist of physical acts; a defendant may also be held liable for verbal acts of concealment. *United States v. Williams*, 2009 WL 579332 (6th Cir. Mar. 9, 2009).

Baumgartner argues that his conduct does not qualify as "concealment" for purposes of the federal misprision statute, 18 U.S.C. § 4, because "18 U.S.C. § 4 does not extend to criminalizing 'concealment' in the form of non-commercial private speech by a non-federal official directed solely to local officials or private citizens." Appellant's Br. at 34. In support of his position, Baumgartner relies on a number of decisions in this and other circuits *affirming*

5

convictions where the defendant's "untruthful statements [were] made to federal authority figures."[1] Appellant's Br. at 39.

We reject Baumgartner's argument. First, the reason that so many misprision cases involve misleading statements to federal authorities is that those are the cases that federal authorities are more likely to discover and more readily able to prosecute. None of the cases Baumgartner cites, however, *requires* that the misleading statements be made to federal authorities. Second, nothing in the language of the statute compels such a narrow reading. The statute prohibits "concealment"; it provides no basis for distinguishing between physical and verbal acts of concealment and there is no logic for doing so. An example may help illustrate the point. If a man grows marijuana on his farm with the intent to distribute, he commits a felony under federal law. If he builds a barbed-wire fence around the farm to prevent the felony's discovery, he is guilty of misprision. And his guilt does not depend on whether, for example, he was already under investigation by federal agents at the time that he built the fence. Nor does it depend on whether the government could prove that it would likely have discovered the farmer's operation were it not for the fence. The statute prohibits "concealment," not "successful concealment" or "concealment *from federal authorities*." The parties would not appear to dispute these points. If instead of building a fence, the farmer simply told all visitors to his farm that he was growing horsemint, not marijuana, he would likewise be guilty of misprision. Just as he built the fence to conceal the felony in the first example, in the second example, he made statements to conceal the felony. And just as it did not matter whether federal authorities would

---

[1] Cases Baumgartner cites include, as cited in his brief at 37–39: *United States v. Clemons*, 166 F.3d 1215 (6th Cir. 1998); *United States v. Williams*, 2009 WL 579332 (6th Cir. Mar. 9, 2009); *United States v. Stuard*, 566 F.2d 1 (6th Cir. 1977) (per curiam); *United States v. Weekley*, 389 F. Supp. 2d 1293, 1295 (S.D. Ala. 2005), *aff'd*, 184 F. App'x 903 (11th Cir. 2006); *United States v. Maese*, 146 F. App'x 276 (10th Cir. 2005); *United States v. Wesley*, 113 F.3d 1244 (9th Cir. 1997); *United States v. Wilkes*, 972 F.2d 344 (4th Cir. 1992); *United States v. Salinas*, 956 F.2d 80 (5th Cir. 1992); *United States v. Ciambrone*, 750 F.2d 1416 (9th Cir. 1982); *United States v. Hodges*, 566 F.2d 674 (9th Cir. 1977); and *United States v. Sampol*, 636 F.2d 621 (D.C. Cir. 1980).

ever have discovered his marijuana crop in the absence of the fence, it does not matter whether they would have discovered it had he not lied to his non-federal-agent visitors. In other words, as mentioned, there is no basis in logic or in the statute for distinguishing between physical acts of misprision and verbal acts.

In addition, as the government points out, several cases in other circuits have affirmed convictions where the statements concealing the felony were not made to federal authorities or where the act of concealment did not involve them. *See* Appellee's Br. at 24–26. These cases include *United States v. Walkes*, 410 F. App'x 800 (5th Cir. 2011) (affirming defendant's conviction where his acts of concealment consisted of falsely telling his employees that the company's Medicare and Medicaid billing practices were legal); *United States v. Robinson*, 344 F. App'x 990, 991 (5th Cir. 2009) (affirming defendant's conviction where his act of concealment consisted of agreeing to be billed by a third-party credit-card processor identified as "ADSOFT" for his child-pornography images, "which necessarily obscured the illicit nature of the transaction"); *United States v. White Eagle*, 721 F.3d 1108 (9th Cir. 2013) (affirming defendant's conviction for misprision of a loan-fraud scheme where defendant falsely told a private citizen that the citizen's deceased wife had outstanding loans in her name that had to be repaid); and *United States v. Sessions*, 2000 WL 1456903, at \*1 (8th Cir. Oct. 2, 2000) (affirming defendant's misprision conviction where defendant misled state or local police officers about the burglary of a gun store).

We therefore reject Baumgartner's argument that verbal misstatements must be made to federal authorities to violate the federal misprision statute. Neither the language of the statute nor the logic behind it compels or even suggests that result. The caselaw in other circuits does not support it. And, even if the statute required concealment *from federal authorities*, speech can

7

conceal the commission of a felony from federal authorities without being made directly to them—for example, it can be made to potential whistleblowers or to potential witnesses at trial. Therefore, Baumgartner's "non-commercial, private speech" can constitute an affirmative act of concealment under the statute.

III

Baumgartner next argues that if the concealment requirement is construed so broadly as to cover his conduct, 1) Congress exceeded its powers under the Constitution in enacting the federal misprision statute and 2) the statute violates the First Amendment as applied to Baumgartner's conduct.

A

In support of his proposed narrow interpretation of the concealment element, Baumgartner argues that "[t]he government's interpretation of 18 U.S.C. § 4 would federalize activities having no connection to any federal investigation and having no ability to impede a federal investigation." Appellant's Br. at 51. He argues that, construed thus, the statute would exceed Congress's authority under the Commerce Clause and the Necessary and Proper Clause. *Id*. at 47. *See* U.S. Const. art. I, § 8, cl. 3, 18. The government responds that "Defendant's Commerce Clause argument lacks merit because 18 U.S.C. § 4 was not enacted under the Commerce Clause." Appellee's Br. at 27. The government continues: "To the extent defendant argues that the Necessary and Proper Clause cannot be used by Congress to pass criminal laws, he is incorrect." *Id.* (citations omitted).

"[I]n determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, we look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally

8

enumerated power." *United States v. Comstock*, 560 U.S. 126, 134 (2010). As Chief Justice Marshall wrote in *McCulloch*: "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." *Ibid.* (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 405 (1819)).

The federal misprision statute criminalizes the concealment of *federal* felonies. No one disputes that Congress has the authority under the Commerce Clause to criminalize the underlying federal felony at issue here—a drug-distribution conspiracy. *See Gonzales v. Raich*, 545 U.S. 1 (2005). The question, then, is whether the misprision statute is "rationally related" to Congress's implementation of that authority and of its authority to enact the other criminal statutes that it has enacted. The answer is yes. Criminalizing misprision of a felony aids federal law-enforcement efforts by making it easier for the government to discover felonies and catch felons. And to the extent that the misprision statute makes it more difficult for would-be felons either to escape detection or to perpetrate their crimes in the first place, the statute may have valuable deterrent effects. Importantly, although these benefits may be most tangible and obvious in the context of an ongoing federal investigation, they also exist even where federal authorities are not involved (or not yet involved) in a case. Deterrence, for example, is forward-looking—a defendant's incentives to commit a crime are not affected by the government's ex-post decision about whether to prosecute a particular case.

Although not every misrepresentation made about a federal felony will hinder federal law-enforcement efforts, enough will do so for us to comfortably conclude that the statute is rationally related to the implementation of Congress's enumerated powers. Baumgartner cites no analogous case holding that Congress's exercise of its authority under the Necessary and Proper

Clause was irrational and therefore unconstitutional. He does cite *Jones v. United States*, 529 U.S. 848, 859 (2000), in which the Supreme Court held that 18 U.S.C. § 844(i), a statute that criminalizes arson of any property used in interstate commerce, "does not cover the arson of an owner-occupied dwelling." But that case dealt with the interpretation of the interstate-commerce requirement for a statute enacted under the Commerce Clause, not what qualifies as "rational" under the Necessary and Proper Clause. Because the federal misprision statute is rationally related to the implementation of the Commerce Clause power, it is a valid exercise of Congress's power under the Necessary and Proper Clause.

**B**

Baumgartner next argues that the federal misprision statute, broadly construed, violates the First Amendment. In particular, he cites the Supreme Court's recent decision in *United States v. Alvarez*, 132 S. Ct. 2537 (2012), for the proposition that, though the government may prohibit speech in order to, for example, "protect the integrity of Government processes," there is no "general exception to the First Amendment for false statements." 132 S. Ct. at 2546, 2544.

The government counters that "the First Amendment is not violated where the speech is the 'very vehicle of the crime itself.'" Appellee's Br. at 31 (citing *United States v. Varani*, 435 F.2d 758, 762 (6th Cir. 1970)). It argues that *Alvarez* is therefore "completely inapplicable here." *Id.* at 33. But that response begs the question whether deeming the speech criminal in the first place violates the First Amendment. In *Alvarez*, the Court held that the Stolen Valor Act, which criminalized "False Claims About Receipt Of Military Decorations Or Medals," violated the First Amendment. The Court warned: "Permitting the government to decree this speech to be a criminal offense, whether shouted from the rooftops or made in a barely audible whisper, would endorse government authority to compile a list of subjects about which false statements

10

are punishable." *Id.* at 2547. The question is thus not whether speech is "the very vehicle of the crime" in this case; it clearly is. Rather, the question is whether criminalizing Baumgartner's speech here was constitutional.

To the extent that the misprision statute criminalizes speech that conceals the commission of a federal felony, it does not violate the First Amendment. Misprision of a felony is not entitled to First Amendment protection merely because it is accomplished through speech rather than other conduct. As the Supreme Court held, "[i]t is apparent from [18 U.S.C § 4], as well as from our history and that of England, that concealment of crime and agreements to do so are not looked upon with favor. Such conduct deserves no encomium, and we decline now to afford it First Amendment protection." *Branzburg v. Hayes*, 408 U.S. 665, 697 (1972) (affirming a reporter's duty "to respond to grand jury subpoena and answer relevant questions put to him"). Like speech to effectuate a fraud, misprision through speech "generally falls outside the protections of the First Amendment." *See Alvarez*, 132 S. Ct. at 2547.

Criminalizing false statements made to a private party that do not clearly hinder federal law-enforcement efforts may present a stronger First Amendment challenge. While the government is correct to note that the misprision statute, unlike the Stolen Valor Act, does not regulate speech on its face, it cites no authority for its apparent contention that Baumgartner's constitutional challenge is weaker because it is an "as applied" challenge, which is to say, it challenges the statute only as applied to criminalize his speech in this case. The Supreme Court has held that, where a statute "may be described as directed at conduct . . . but as applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message," the application of the statute is subject to strict scrutiny for compliance with the First Amendment. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010) (applying strict

11

scrutiny to uphold law banning material support for terrorist organizations where such support took the form of speech).

Nonetheless, although a restriction on private speech that conceals a felony is a content-based restriction, "content-based restrictions on speech have been permitted . . . when confined to the few historic and traditional categories of expression long familiar to the bar." *Alvarez*, 132 S. Ct. at 2544 (quotation and alteration marks omitted). As mentioned, speech that constitutes misprision of a felony appears to qualify as one of these "historic and traditional categories of expression" not protected under the First Amendment. *See Branzburg*, 408 U.S. at 697 (noting that concealment of a crime is not afforded First Amendment protection in light of "our history and that of England"). Baumgartner provides no historical or precedential support for distinguishing, in this context, between speech made to federal authorities and that made to local officials or private citizens. And indeed, it is doubtful that any such support exists, since at common law, the mere failure to report a crime constituted misprision, even without an affirmative act of concealment. In other words, the scope of the historic and traditional category of unprotected misprision speech appears to include all speech that conceals the actual commission of a felony, regardless of to whom that speech is directed.

Because any concealment of the drug conspiracy via "non-commercial, private speech . . . to local officials [and] private citizens," Appellant's Br. at 27, was not entitled to First Amendment protection, we reject Baumgartner's First Amendment challenge.

12

## IV

In his next claim, Baumgartner argues that the evidence at trial was insufficient to support his convictions.

Evidence is sufficient to support a conviction if, "after viewing the evidence in the light most favorable to the government, *any* rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We are "bound to make all reasonable inferences and credibility choices in support of the jury's verdict," *United States v. Newsom*, 452 F.3d 593, 608 (6th Cir. 2006), and must "refrain from independently judging the weight of the evidence." *United States v. Suarez*, 263 F.3d 468, 476 (6th Cir. 2001).

To reiterate, this court has construed the misprision statute as being comprised of four elements, each of which must be proven beyond a reasonable doubt to sustain a conviction: "(1) the principal committed and completed the felony alleged; (2) the defendant had knowledge of the fact; (3) the defendant failed to notify the authorities; and (4) the defendant took affirmative steps to conceal the crime of the principal." *Goldberg*, 862 F.2d at 104. Baumgartner argues that the evidence was insufficient for a rational trier of fact to have found any of these elements beyond a reasonable doubt.

The first question is whether the evidence was sufficient for a rational trier of fact to conclude that Castleman was involved in a drug conspiracy. We address this question with respect to each count. Baumgartner first argues that the evidence did not show that Castleman was involved in a conspiracy, as required to support a conviction on Count 1, when he first asked her to buy drugs in May 2009. In general, "a 'buyer-seller relationship' is not enough to make someone a participant in a drug conspiracy." *United States v. Henley*, 360 F.3d 509, 514 (6th

13

Cir. 2004). Rather, "further evidence indicating knowledge of and participation in the conspiracy" is required. *Ibid.* Evidence of multiple transactions for large quantities of drugs can be sufficient for this purpose. *See ibid.*

Castleman testified that at the time of her meeting with Baumgartner in 2009, she was regularly using illegal drugs, and she admitted to Baumgartner that she was using one such drug, suboxone. She testified that her life was "a mess" and that she was "strung out on pills." Baumgartner asked her if she could obtain pills for him, and she said yes. When asked at trial how she knew that she could acquire the pills, Castleman testified: "Because I had people I could buy them from." She testified as to the identities of a few of those people. She testified that she took about $150 or $175 from Baumgartner to purchase pills for him but instead used the money to get high. The government asked: "How many pills at a time would you get from these people when the pills were for you personally." She answered, "Just a couple, like—I don't know—two or three." There was no testimony as to whether she distributed pills to anyone else, and if so, how many. Castleman did testify, however, that her suppliers would sometimes "front" her pills, i.e., give them to her "in advance with no money."

The government argues that Castleman's testimony—in particular, a) that her suppliers would sometimes "front" her drugs and b) that she would have been able to obtain for Baumgartner what the government characterizes as "a relatively large quantity of pills for defendant"—was sufficient to enable the jury to conclude that she was a participant in a drug conspiracy. But the cases on which the government relies involve very different sets of facts. *Henley* does not hold that "fronting," without more, is alone sufficient to prove participation in a conspiracy; it was simply one indicium, which surely had far more import given the "large quantities of methamphetamine" that were involved in the case (the district court found Henley

14

personally responsible for at least 5 kilograms of the drug). *See Henley*, 360 F.3d at 514. Fronting what appears to have been "two or three" pills at a time to an addict who confessed she "always needed money" is not, without more, sufficient to indicate participation in a drug conspiracy beyond the so-called buyer-seller relationship. The government cites *United States v. Grunsfeld*, 558 F.2d 1231, 1235 (6th Cir. 1977), for the proposition that the ability to obtain a significant amount of drugs in a short period of time for another person indicates participation in a conspiracy. That is true, but in *Grunsfeld*, the involvement of the defendant that the government appears to be referencing, "while primarily consisting of purchases of the tablets, also was further evidenced by his representation to undercover agents of the Drug Enforcement Agency that he could get for them 1,000,000 tablets for PCP in ten hours and that his organization had sold 5,000,000 over the summer." *Ibid.* There is no comparison to this case. No rational trier of fact could have found beyond a reasonable doubt that Castleman was involved in a drug conspiracy as of May 2009. We therefore vacate the conviction as to Count 1.

Baumgartner also argues that the evidence was insufficient to show that Castleman was involved in a drug conspiracy for purposes of Counts 4 through 7. We reject this argument. Castleman testified that Baumgartner was giving her $250 to $300, 2 to 3 times per week, for months, to purchase pills on his behalf, and that she was making money on the transactions. Two of her co-conspirators also testified that she paid them cash to transport her to and from drug deals and sometimes to and from Baumgartner's office for purposes of conducting the transactions. The evidence was sufficient to enable a rational jury to conclude that, by the time the conduct underlying Counts 4 through 7 of the indictment took place, Castleman was participating in or had participated in a drug conspiracy.

15

The next question is whether the evidence was sufficient to enable a rational jury to conclude that Baumgartner knew about the conspiracy—the second element of the misprision charge. As mentioned, the evidence was insufficient to show that Castleman was a participant in a drug conspiracy at the time of the conduct underlying Count 1. For the same reasons, the evidence was insufficient to show that Baumgartner was aware of her participation. The evidence does not suggest that Baumgartner knew more than that Castleman was on drugs and could obtain pills for him at that time. The evidence was sufficient, however, for a rational jury to conclude beyond a reasonable doubt that Baumgartner was aware of her participation when the conduct underlying Counts 4 through 7 took place. Castleman testified that she told Baumgartner about her co-conspirators. She also testified about the regularity and extent of her interactions with Baumgartner and her drug transactions on his behalf. A rational jury could have easily concluded that Baumgartner knew by February 2010 that she was involved in a drug conspiracy.

We turn to the third element of the misprision charge, namely, whether Baumgartner notified federal authorities about the felony. There is no indication that he did. Baumgartner argues that the government failed to prove Baumgartner's omission beyond a reasonable doubt because it did not offer affirmative evidence of Baumgartner's failure to contact the authorities. But Baumgartner cites no law for the proposition that the government was obligated to, for example, search federal law-enforcement databases for any reports Baumgartner may have given about the conspiracy, or interview federal law-enforcement officers to prove the absence of the same. The jury could have reasonably concluded, based on all the evidence adduced at trial and Baumgartner's failure to contend otherwise, that Baumgartner failed to disclose the felony to federal authorities.

16

The last question is whether the evidence was sufficient for a rational jury to conclude that Baumgartner took affirmative steps to conceal the actual commission of the felony. The government, at closing argument, explained how the evidence at trial showed that Baumgartner concealed the felony:

> [Baumgartner] concealed and covered up Deena Castleman's crimes. Every time he approached these people and painted this false picture of who Deena Castleman was, it was to deflect attention away from Deena Castleman.
>
> What was his reason for doing that? Well, one, he knew that he wanted access to Deena Castleman because, when Deena Castleman is behind bars, she can't take his money to go get drugs for him. When Deena Castleman is behind bars, she can't perform oral sex on him.
>
> But there's another reason why he had to conceal and cover up what Deena Castleman was really doing and who she really was criminally. It exposed him. He was at risk, because if people start asking questions and reports start being made and the gentlemen with the TBI [Tennessee Bureau of Investigation] get involved, that's not good for him, that is not good for the Defendant.
>
> Because several things will happen, things that he does not want to have happen. When law enforcement gets involved and people start asking questions, that sex is going to stop, the pills are going to stop, perhaps most importantly, he becomes the target of a criminal investigation.
>
> He could not have that. That's why he lied, that's why he took the initiative to go seek all these people out. Again, we wouldn't be here if he had kept his mouth shut, because the law doesn't require people to notify the authorities when crimes have been committed. But the law does require you to keep from covering up other people's crimes. That's why we're here.

The government thus argued that Baumgartner made misrepresentations about Castleman to cover up the underlying drug conspiracy, and that he did so to protect his source of supply and to protect himself.

Whether Baumgartner's statements qualify as concealment of the actual commission of a felony may seem more difficult at first blush. In Baumgartner's defense, the statements themselves did not relate to the drug conspiracy—they were misstatements about Castleman, her

17

character, her drug *use*, and her continued involvement in drug court. But the question is not whether the *content* of the statements concealed the felony; rather, it is whether his *making the statements*—his efforts to protect Castleman—concealed the felony. And a reasonable juror could conclude that they did. All of the statements proved against Baumgartner were designed to keep Castleman out of the clutches of law enforcement and to keep her placated with respect to Baumgartner's relationship with her. In these respects, each statement could have had the effect of making the detection of the conspiracy more difficult. If Castleman were treated by law enforcement and the transitional housing director as a "good drug court candidate" who was "turning her life around," it would have been considerably less likely that she would have been investigated further and connected with a wide-ranging drug conspiracy—one that involved Baumgartner himself. Whether he in fact intended such concealment was a matter reasonably left for the jury to determine. Based on the evidence adduced at trial, a rational juror could have agreed that concealment occurred and was intended.

## V

Baumgartner's final argument is that the district court's instructions to the jury were defective.

First, Baumgartner argues that the district court should have instructed the jury on the buyer-seller-relationship exception to involvement in a conspiracy. "Generally, a buyer-seller relationship alone is insufficient to tie a buyer to a conspiracy because mere sales do not prove the existence of the agreement that must exist for there to be a conspiracy." *United States v. Deitz,* 577 F.3d 672, 680 (6th Cir. 2009) (quotation marks omitted). "Nonetheless, we have often upheld conspiracy convictions where there was additional evidence, beyond the mere

18

purchase or sale, from which the knowledge of the conspiracy could be inferred." *Ibid.* (quotation and alteration marks omitted).

As the government correctly notes, "[a] buyer-seller instruction is unnecessary if the judge has given a complete instruction reciting all the elements of conspiracy and requirements for membership in a conspiracy." *United States v. Cook*, 13 F. App'x 331, 337 (6th Cir. 2001). Baumgartner does not appear to dispute the government's claim that a complete instruction on conspiracy was given, consistent with this court's pattern jury instruction for conspiracy. We therefore reject Baumgartner's argument that the district court abused its discretion in declining to instruct the jury on the buyer-seller exception.

Baumgartner's second objection to the jury instructions is that the district court erred in instructing the jury on deliberate ignorance. The district court explained that the jury could infer Baumgartner's knowledge of a drug conspiracy if it found that he deliberately ignored a high probability that Castleman was involved in a drug conspiracy. The district court so instructed the jury in light of evidence at trial that Baumgartner had asked Castleman not to talk to him about her co-conspirators and would raise his hand to stop her when she would do so.

The deliberate-ignorance instruction was appropriate because Baumgartner claimed that he did not know about the conspiracy, and the evidence suggested that an inference of knowledge based on Baumgartner's deliberate ignorance was reasonable. The district court did not abuse its discretion in instructing the jury on deliberate ignorance.

## VI

We AFFIRM Baumgartner's conviction on Counts 4 through 7 and REVERSE and VACATE his conviction on Count 1.

**CLAY, Circuit Judge, concurring in part and dissenting in part.** That Defendant Richard Baumgartner is a liar and a drug abuser is beyond dispute. Defendant's lies facilitated a narcotics conspiracy principally directed to ensuring that Defendant himself stayed supplied with illegal pain killers. But Defendant is not being charged with conspiracy or aiding and abetting. He is charged with misprision of felony—concealing a federal crime. The government urges, and the majority accepts, that some combination of deceit and criminality can add up to concealment if you look at it from the right angle. This interpretation gives the misprision statute a stunningly broad reach. The government proved that Defendant lied and was tangled up in drugs. But the government did not prove that Defendant concealed the underlying felony— the narcotics conspiracy helmed by Deena Castleman. I would vacate Defendant's conviction on all counts, not just count 1, and therefore respectfully dissent in part.

We begin with the bare text of the misprision statute, which reads:

Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both.

18 U.S.C. § 4. We have held that this language translates into four elements for the government to prove: "(1) the principal [in this case, Castleman] committed and completed the felony alleged; (2) the defendant had knowledge of the fact; (3) the defendant failed to notify the authorities; and (4) the defendant took affirmative steps to conceal the crime of the principal." *United States v. Goldberg*, 862 F.2d 101, 104 (6th Cir. 1988). My disagreement with the majority comes at step four—concealment.

The misprision statute does not define the term "conceals," and the term is not directly modified by other portions of the statute. But we approach language in criminal statutes with certain background presumptions, some of which are particularly relevant here. First, we should

20

pay close attention to the "ordinary meaning" of the statutory language. *Johnson v. United States*, 559 U.S. 133, 138 (2010). Second, we should show "restraint in assessing the reach of a federal criminal statute, both out of deference to the prerogatives of Congress, and out of concern that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *Arthur Andersen LLP v. United States*, 544 U.S. 696, 703 (2005) (quotation marks and citation omitted). In light of these presumptions, I construe the concealment element of the misprision statute somewhat more narrowly than the majority.

Concealment cannot exist in a vacuum. If one conceals a fact—that is, if someone "prevents or hinders the discovery of something," Black's Law Dictionary 282 (7th ed. 1999), or "prevent[s] disclosure or recognition of" something, Webster's Third New Int'l Dictionary 469 (1993)—the fact is concealed *from* someone. The question this case presents is "from whom?" A reader, considering the fact that Defendant lied to judges and other persons of authority, might well think that the government's answer to that question is "officials of some form or another." But the government's theory of the concealment element is far broader and vaguer. At oral argument on May 9, 2014, this Court and the government engaged in the following colloquy:

> Q: By lying to various people about various things, you keep [Castleman] happy, and that conceals the conspiracy?
>
> A: Yes, on these facts. . . .

Oral Arg. Rec. at 27:20. Thus, according to the government, Defendant's lies did not in and of themselves constitute "concealment." Rather, the lies were the mechanisms to keep Castleman happy, and it was her happiness that effectuated the concealment. In other words, Defendant accomplished his concealment by appeasing the very person who had committed the underlying felony. The ultimate target of the concealment is presumably some unknown official whom

21

Castleman might have approached (waiving her Fifth Amendment privilege against self-incrimination in the process), had Defendant not kept her out of prison. This is a triple-bank-shot interpretation of concealment.

The majority's construction of the statute is even broader than the government's. To show the stunning reach of the majority's interpretation, we need only continue the tale of the lying marijuana grower described in the majority opinion. Maj. Op. at 6–7. Suppose that one of the visitors to the farm is the farmer's brother-in-law, Bill. The farmer feeds the horsemint line to Bill, but Bill knows marijuana when he sees it, and can deduce from the size of the farmer's plot that the end product is not meant purely for personal use. When Bill returns home, his wife asks him how the farmer's garden is growing. Bill, not wanting to get into an extended discussion with his wife about her brother's marijuana, tells her that the farmer seems to have a successful horsemint crop. According to the majority's logic, unless Bill quickly finds a federal prosecutor or judge and reveals the farmer's crime, Bill himself is guilty of misprision of felony.[1]

Thus does misprision extend the U.S. criminal code into everyday conversations between a husband and wife who have committed no crime apart from speech about others' misdeeds. *Cf. Arthur Andersen*, 544 U.S. at 704 (construing the witness tampering statute away from possibly criminalizing "a wife who persuades her husband not to disclose marital confidences"); *United States v. Worcester*, 190 F. Supp. 548, 566 (D. Mass. 1961) (Wyzanski, J.) ("To suppose that Congress reached every failure to disclose a known federal crime, in this day of myriad federal

---

[1] The majority's hypothetical takes another wrong turn when it suggests that if a marijuana grower erects a fence to keep away prying eyes, that act makes the grower guilty of misprision. In order to be guilty of misprision, a defendant must both conceal a felony and also fail to notify federal authorities of that crime. *See Goldberg*, 862 F.2d at 104. The misprision statute "would be unconstitutional under the Fifth Amendment if, and to the extent, it required a defendant to report her own criminal conduct to the authorities." *United States v. Brizan*, 709 F.3d 864, 866 (9th Cir. 2013); *see also United States v. Kuh*, 541 F.2d 672, 676–77 (7th Cir. 1976).

22

tax statutes and regulatory laws, would impose a vast and unmeasurable obligation. It would do violence to the unspoken principle of the criminal law that as far as possible privacy should be respected." (quotation marks omitted)). I fail to see how this construction would not "encourage arbitrary and discriminatory enforcement" of the misprision statute, and thus run afoul of the vagueness doctrine. *Skilling v. United States*, 561 U.S. 358, 402–03 (2010) (quotation marks omitted).

We can easily construe the misprision statute so as to avoid these pitfalls—and we should. *See id.* at 405–06; *cf. Bond v. United States*, 134 S. Ct. 2077, 2091 (2014) (construing statute to avoid "'a substantial extension of federal police resources'"). At its heart, misprision is designed to discourage interference with the investigation and prosecution of federal crimes—the federal courts have never given the statute the breadth of its common law predecessor, which presupposed an affirmative duty to disclose treason or criminality. *See Branzburg v. Hayes*, 408 U.S. 665, 696–97 & n.36 (1972). Some nexus should therefore be required to exist between the concealment of the principal's crime and an investigation or proceeding (whether state or federal) related to that criminal conduct. That nexus could be established in a number of ways. The defendant might know about an investigation, or reasonably should know about an investigation. Or the government could go the opposite route, and show that but for the defendant's concealment, an investigation or proceeding would have commenced. Either way, there is nothing in the record of this case to suggest that Castleman's drug conspiracy was or would have been the target of any investigation, regardless of Defendant's lies.

The construction I propose is not novel, nor would it upset the jurisprudence of misprision. Instead, it is this case that presents a dramatic extension of the statute to fit circumstances where the government cannot find another federal crime to charge. Consider the

23

contrast between this case and one it resembles, *United States v. Daddano*, 432 F.2d 1119 (7th Cir. 1970). *Daddano* centered on a bank robbery and subsequent cover-up. The robbery took place in September 1963, and in the following two weeks, some but not all of the perpetrators were arrested and indicted. *See id.* at 1121–22. This selective prosecution made the robbers think there was a rat among them. *See id.* at 1122. William Daddano thought it a good idea to hook the crooks up to lie detectors and ask them who was informing. *See id.* at 1122. The liars would be shot. *See id.* The polygraphs were administered, but all came back negative. *See id.* Daddano, however, was later tried and convicted of misprision of felony. The Seventh Circuit held that there was sufficient evidence of concealment: "the giving of the lie detector test was an affirmative act . . . . At trial there was evidence which tended to prove that defendants intended that anyone found to have furnished information to the authorities would be silenced, and that the entire procedure and accompanying threats . . . were intended to emphasize to all participants the desirability of withholding information from the authorities." *Id.* at 1124. Like in the case now before us, *Daddano* involved concealment where the immediate targets were the people who committed the underlying felony. But unlike in our case, *Daddano* clearly involved an ongoing investigation and prosecution of the principals' crime. That key difference shows just how far outside the scope of the misprision statute the present case falls.

Again, the majority's interpretation of the concealment element gives the misprision statute a stunningly broad scope. I have no doubt that this version of the statute would leave huge numbers of our fellow citizens vulnerable to criminal indictment, but for the unchecked discretion of federal prosecutors. I respectfully dissent.

24